**NEW YORK LIFE INSURANCE COM-
PANY, etc., Plaintiff,**

v.

**G. H. C. PROPERTIES, LTD., etc., et al.,
Defendants.**

**No. 72-43-Civ-J.**

United States District Court,
M. D. Florida,
Jacksonville Division.

Dec. 11, 1972.

Karl Vance Hart and Lawrence R. Metsch, Shutts & Bowen, Miami, Fla., for plaintiff.

George C. Black, Jr., Irving, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

WILLIAM A. McRAE, Jr., Chief Judge.

The New York Life Insurance Company (Plaintiff) brought this diversity action for breach of contract against G.H.C. Properties, Ltd., a limited partnership, B. M. Grantland, and B. J. Case (Defendants) seeking liquidated damages in the amount of $47,500.00 and an award of attorney's fees. The Defendants denied liability and counter-claimed for the recovery of a $47,500.00 deposit which had been paid to the Plaintiff. The Plaintiff having moved for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, and the Court having considered the pleadings, the admissions on file, the affidavits submitted by the Plaintiff, and the memoranda of law filed by the parties, it is the ruling of the Court that summary judgment be granted in favor of the Plaintiff with respect to the Plaintiff's claim for liquidated damages and with respect to the Defendants' counter-claim.

## I. THE CONTRACT BETWEEN THE PARTIES

On February 25, 1969, the Plaintiff and the Defendants entered into a written agreement in which the Plaintiff committed itself to make, and the Defendants committed themselves to accept, a first mortgage loan with respect to the construction of a shopping center located in Jacksonville, Duval County, Florida, known as Normandy Mall. In addition to a first mortgage, the Defendants agreed to provide additional security to the Plaintiff through the assignment of leases covering floor space within the Normandy Mall. This contract provision read:

"Occupancy Leases. Each lease of any part of the Real Property shall be executed in form satisfactory to our Office of the General Counsel and assigned to us as additional security for the loan. The assignment shall be recorded and notice thereof served on the tenants. As to each lease to be assigned, the lease shall be in full force and effect, there shall be no rental offsets or claims or defenses to enforcement of the lease, the tenant shall have occupied its premises, confirmed commencement of the lease term, and shall have acknowledged that it is in occupancy and paying rent on a current basis. Evidence to that effect satisfactory to us shall be furnished us. The substance of all leases affecting any part of the Real Property shall be satisfactory to us, including the term, the tenants, and the rent payable. Within a reasonable time prior to date of closing, you shall meet our requirements as to which leases, if any, shall be made superior and which shall be made superior and which shall be made subordinate to our mortgage." (First paragraph, page 2, Mortgage Loan Commitment)

Paragraph 13 of the Mortgage Loan Commitment provided:

"Survey. Within a reasonable time prior to date of closing, a survey of a licensed surveyor, satisfactory to us and the title company, prepared after completion of improvements and dated not more than 30 days prior to closing, shall be furnished to us. The survey shall show dimensions and total square foot area of the Real Property; interior lot lines, if any, dimensions and location of improvements; parking areas; easements if any; location of adjoining streets; and the distance to and names of nearest intersecting

streets; and such other details as to the Real Property as may be requested by us."

Paragraph 22 of the Mortgage Loan Commitment made additional provision for leases to be obtained by the defendants:

"Subject to all of the requirements set forth under "Occupancy Leases" at the top of Page 2 of this Mortgage Loan Commitment, and without in any way limiting any of such requirements, there shall be in full force and effect prior to date of closing leases to tenants, for terms and rentals set forth in the annexed schedule, all other terms and conditions of such leases to be satisfactory to us."

The following table reflects the pertinent information which appeared in the schedule annexed to the Mortgage Loan Commitment and referred to in Paragraph 22:

| TENANTS | SQ. FT. AREA LEASED | LEASE TERM IN NO. OF YEARS | LEASE % RENT CLAUSE | MIN. GUAR. ANN. RENT. |
|---|---|---|---|---|
| Woolco | 103,000 | 20 | 1% | $169,945 |
| Rose's | 50,000 | 20 | 1% | 97,500 |
| Food Fair | 26,000 | 20 | 1% | 52,000 |
| Walgreen Drug | 15,000 | 15 | — | 37,500 |
| Kinney Shoes | 3,600 | 20 | 4% | 17,460 |
| Kay Jewelry | 2,000 | 15 | 4% | 10,000 |
| J. J. Newberry | 8,000 | 20 | 4% | 28,000 |
| Schwobilt | 6,000 | 20 | 4% | 18,000 |
| Hallmark Cards | 1,925 | 20 | 7% | 8,600 |
| Endicott Johnson | 4,000 | 20 | 5% | 20,000 |
| Loft's Candy | 1,500 | 15 | 5% | 9,000 |
| Singer Sewing Mach. | 4,000 | 15 | 4% | 18,000 |
| Howard Clothes | 5,000 | 20 | 2.5% | 15,000 |
| Park Lane Hosiery | 1,500 | 15 | 6% | 8,250 |
| Orange Julius | 1,000 | 25 | 10% | 10,000 |
| Burger Chef | 1,760 | 20 | — | 15,000 |
| Trans Lux Theatre | 8,800 | 20 | 8% | 24,200 |
| Bressler's Ice Cream | 1,000 | 10 | 5% | 5,400 |
| Mangels L/W | 6,000 | 20 | 6% | 19,500 |
| City Wide Dist. | 5,000 | 10 | 7% | 20,000 |
| Regis Beauty Shop | 1,000 | 20 | 10% | 4,900 |
| Florida Optical | 1,200 | 20 | — | 6,000 |
| Federal Bake Shop | 2,500 | 20 | — | 12,500 |
| Cleveland Fabrics | 2,075 | 15 | — | 10,000 |
| National Shirt | 2,000 | — | — | 8,000 |
| TOTAL | 263,860 | | | $644,755 |

The Mortgage Loan Commitment called for a loan from Plaintiff to Defendants in the amount of $4,750,000, to be repaid over a twenty-five year period by means of monthly payments in the amount of $37,451.38. The Mortgage Loan Commitment specified an annual interest rate of 8¼%.

Paragraph 18 of the Mortgage Loan Commitment stipulated:

"Liquidated Damages. In consideration of our making this commitment

and holding ourselves willing and ready to acquire the Loan within the time hereinafter stated, and in further consideration of the substantial services which we, as prospective mortgagee, have rendered and will be required to render and incur in preparation for the closing, and in view of the difficulty of ascertaining the amount of damages which would be sustained by us should this Loan not be accepted by us, your acceptance of this commitment shall constitute your unconditional obligation to pay New York Life Insurance Company as liquidated damages the sum of $95,000 on our demand if the Loan has not been acquired by us on or before the expiration date of the commitment as herein set forth in full compliance with the condition of this commitment. If the Loan has not been accepted by us by the said expiration date or if you have defaulted prior to said date, in any of the terms or conditions of this commitment, unless we have waived such default in writing, our obligations hereunder shall cease as of said expiration date or as of such earlier date, but your obligation for the payment of damages by reason of such default shall survive until fully paid and satisfied. Your acceptance of any other loan commitment with respect to the Real Property, except for said interim financing, shall be deemed a default hereunder."

Paragraph 19 of the Mortgage Loan Commitment provided that the Defendants deposit with the Plaintiff the sum of $95,000 cash as security for the Defendants' performance of their obligations under the Commitment, such deposit to be subject to forfeiture as liquidated damages (paragraph 18) should the Mortgage Loan Commitment for any reason not be consummated on schedule. A note to paragraph 19 reflected the Plaintiff's receipt of the Defendants' check for $47,500, and requested that the Defendants forward to the Plaintiff another check in the same amount.

The Mortgage Loan Commitment, at paragraph 20, recited:

"Expiration Date—Date of Closing. The acquisition of the Loan by us shall take place as soon as all of the conditions of this commitment have been met but not earlier than March 1, 1971, and not later than June 1, 1971. Our obligation under this commitment to make (or purchase) this mortgage loan and your obligation to accept (or sell) may be extended by us beyond the last mentioned date in writing, from time to time, in our sole discretion, if the conditions of this commitment have not been met by said date."

Paragraph 17 of the Mortgage Loan Commitment dealt with attorneys' fees as follows:

"Expenses. Your acceptance of this commitment shall constitute your unconditional agreement to pay all fees, expenses, and charges in respect to the Loan, or its making or transfer to us or in any way connected therewith including without limiting the generality thereof, the fees and expenses of local counsel should local counsel be employed by us in connection with this transaction . . . Your obligation for such expenses, fees, charges, compensation, and taxes shall be in addition to your obligation to pay the amount of liquidated damages, if any, hereinafter referred to."

## II. THE POST-CONTRACT NEGOTIATIONS

Attached to Plaintiff's affidavit in support of its motion for summary judgment, the Plaintiff has submitted photostatic copies of correspondence exchanged between the parties following the February 25, 1969, execution of the Mortgage Loan Commitment. This series of letters reveals the following course of negotiations.

By written agreement dated July 2, 1971, the Mortgage Loan Commitment was modified and the date for closing was extended to October 1, 1971. As consideration for the extension of the

Mortgage Loan Commitment, the Defendants acceded to an increase of the loan interest rate from 8¼% per year to 8¾% per year. A letter of credit, in the amount of $47,500 (which had been forwarded to the Plaintiff by the Defendants as the second half of the $95,000 security deposit) was extended until October 1, 1971, thereby coinciding with the new expiration date of the Mortgage Loan Commitment.

The reason for the extension of the Mortgage Loan Commitment was the inability of the Defendants to timely comply with the "Occupancy Leases" provision and paragraphs 13 and 22. Prior to October 1, 1971, the Defendants transmitted for the Plaintiff's approval a list of substitute tenants for the Normandy Mall project. On October 18, 1971, the Plaintiff forwarded to the Defendants a proposed amendment to the Mortgage Loan Commitment which incorporated the substituted leases but which also reduced the amount of the loan to $4,500,000 and increased the annual interest rate to 8⅞%. The Defendants, on or about November 3, 1971, notified the Plaintiff that the latter's proposed amendments, submitted October 18, 1971, were not acceptable to the Defendants and that the Defendants considered the entire Mortgage Loan Commitment null and void.

By letter dated November 15, 1971, the Plaintiff demanded that the Defendants pay to the Plaintiff the additional sum of $47,500 as liquidated damages (the extended letter of credit having expired on October 1, 1971). On November 23, 1971, the Defendants demanded that the Plaintiff refund the $47,500 initially deposited by the Defendants with the Plaintiff pursuant to paragraph 19 of the Mortgage Loan Commitment. The legal basis for this refund demand was the Defendants' claim that the Plaintiff had endeavored to deviate from the terms of the Mortgage Loan Commitment and to force a consummation of the loan transaction on terms more favorable to the Plaintiff than those set out in the contract.

All of the foregoing facts are undisputed.

## III. THE PLEADINGS

The Plaintiff instituted this action on February 8, 1972, demanding the sum of $47,500 as liquidated damages plus an award of attorneys' fees and costs. The Defendants on April 13, 1972, answered the complaint and asserted a counterclaim. The answer denied liability to the Plaintiff; charged that the Plaintiff and its agents had obstructed and impeded the closing by their "unreasonable failure to approve and expedite approval of the occupancy leases and other conditions of the commitment in a timely manner", thereby estopping the Plaintiff from recovery; alleged that the liquidated damages provision constituted a penalty; and asserted that the $47,500 received and retained by the Plaintiff more than compensated the Plaintiff for its actual damages, if any. The counterclaim sought judgment for the $47,500 received and retained by the Plaintiff, and other damages, alleging:

"6. The plaintiff, its agents and attorneys unreasonably obstructed and impeded the closing of the loan transaction pursuant to the commitment by their failure to approve the submitted occupancy leases and other documents and by their failure to expedite approval of the contemplated leases so that it was, as a practical matter, impossible for the defendants to close the loan transaction in accordance with the terms of the commitment.

"7. As a result of such actions on the part of the plaintiff and its agents, the defendants, despite their full performance of all duties of theirs under the commitment were prevented from closing in accordance with the commitment and were compelled to make additional and further financial arrangements for the financing of the shopping center, which resulted in unfavorable terms and more costly interest rates."

The Plaintiff, on May 1, 1972, denied the essential allegations of the counter-claim.

## IV. THE ADMISSIONS OF THE DE-FENDANTS

On June 29, 1972, the Plaintiff, acting pursuant to Rule 36, Federal Rules of Civil Procedure, served upon the Defendants requests for admissions. The first two numbered requests for admissions stated:

"1. Under a mortgage and loan commitment agreement between G.H.C. Properties and New York Life Insurance Company dated February 25, 1969, (hereinafter the "Agreement") and an agreement dated July 2, 1971, modifying the Agreement, defendants were required, under penalty of default, to negotiate and enter into leases with specified tenants for terms and at rentals as set forth in a schedule annexed to the Agreement on or before October 1, 1971, (hereinafter "Default Date").

"2. As of the Default Date, defendants had failed to negotiate or enter into the requisite leases with specified tenants for terms and at rentals as set forth in a schedule annexed to the Agreement."

The succeeding twenty-four (24) requests for admissions asked the Defendants to admit that, as of October 1, 1971, they had failed to secure the tenants and terms as specified in the schedule annexed to the agreement of February 25, 1969.

On July 27, 1972, the Defendants, through defendant B. J. Case, responded to the requests for admissions. Requests 3 through 27 (corresponding to each prospective tenant appearing on the schedule) were admitted subject to the answers contained in Admissions 1 and 2:

"1. Denied. It was the understanding of G.H.C. Properties, Ltd., that as long as a certain annualized rent roll was achieved with an appropriate mix of prime and secondary tenants, the loan would be funded. The list of tenants annexed to the loan commitment was representative of a desired tenant mix but was no way agreed by the parties to be the only tenants which would be permitted to occupy the center.

"2. Denied. The tenants and specified terms contained in the annexed list to the loan commitment were not "requisite" to the funding of the loan commitment."

## V. THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, on October 4, 1972, moved for summary judgment with respect to the Defendants' liability for liquidated damages in the amount of $47,500 and for an award of attorneys' fees. In support of its motion, the Plaintiff submitted a lengthy memorandum of law with supporting affidavits and exhibits. The Defendants filed no affidavits in opposition to the Plaintiff's summary judgment motion; their only response was a memorandum, the full text of which follows:

"Comes (sic) now G.H.C. Properties, Ltd., a limited partnership; B. M. Grantland and B. J. Case, individually and d/b/a G.H.C. Properties, Ltd., hereinafter collectively referred to as Defendants, and in reply to Plaintiff's Motion for Summary Judgment would respectfully show unto the Court as follows:

"That based on the pleadings on file, the counterclaims and cross-action on file, the admissions on file, the affidavits on file, and the Reply to Plaintiff's Motion for Summary Judgment, there are genuine issues as to numerous material facts and Plaintiff is not entitled to judgment as a matter of law.

"A review of the affidavits and exhibits attached to such affidavits clearly establishes the fact that according to Plaintiff's own representatives, the lease contracts furnished to Plaintiff by G.H.C. Properties, Ltd., were never rejected by Plaintiff as failing to comply with the tenant re-

quirements contained in the original commitment. Indeed, the affidavits and exhibits attached to such affidavits indicate that Plaintiff's representatives felt that the lease contracts with those particular tenants would qualify if certain amendments were made to such lease contracts. At no time did Plaintiff's representatives ever state Defendants that the particular tenant was not scheduled as a prospective tenant in the commitment between Plaintiff and Defendants.

"Wherefore, premises considered, Defendants pray judgment of this Court that Plaintiff's Motion for Summary Judgment be in all things denied; that the Court enter its order thus finding all facts actually in controversy both with reference to Plaintiff's original cause of action and Defendants' counterclaim; and for such other and further relief, to which the Defendants may show themselves justly entitled."

## VI. THE UNDISPUTED FACTS

The Court has carefully reviewed the pleadings, admissions on file, affidavits, and exhibits in this case, and finds that the following facts are undisputed:

A. As of October 1, 1971, the Defendants had failed to secure the tenants and terms as specified in the schedule annexed to the Mortgage Loan Commitment executed on February 25, 1969.

B. Nothing in the contract itself or in the correspondence between the parties supports the Defendants' position that as long as a certain annualized rent roll was achieved with an appropriate mix of prime and secondary tenants, the mortgage loan would be funded.

C. Prior to October 1, 1971, the Defendants asked the Plaintiff to approve certain proposed leases with prospective tenants not listed on the schedule annexed to the Mortgage Loan Commitment.

D. The Plaintiff's letter of October 18, 1971, to the Defendants, in which the approval of the substituted leases was discussed, was addressed to a possible mortgage loan commitment entirely separate and distinct from the one executed on February 25, 1969, in that the amount of the new loan was significantly reduced and the interest rate increased.

## VII. DISCUSSION

In its memorandum of law in support of its motion for summary judgment, the Plaintiff has taken the position that it is entitled to judgment on the undisputed facts of this case. The Defendants have not disputed the applicability of Florida law to this action. Under the mandate of the United States Supreme Court's decision in Erie Railroad Company v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, this Court will be guided by the jurisprudence of the State of Florida in its analysis of the issues presented in this matter.

The Defendants have admitted that, as of October 1, 1971, they had not secured the leases specified in the schedule annexed to the Mortgage Loan Commitment of February 25, 1969. They seek to justify and excuse that failure by arguing that the parties to the February 25, 1969, agreement did not intend to limit the acceptable leases to those specified in the annexed schedule and by contending that the Plaintiff arbitrarily and unreasonably hindered the Defendants' efforts to substitute other tenants for those listed in the schedule. Under Florida law, the parole evidence rule clearly bars this attempt to vary the plain terms of the February 25, 1969, agreement with respect to acceptable tenants and leases. See, 13 Fla.Jur., "Evidence", Section 383; Sears v. James Talcott, Inc., (2 Fla.App.1965), 174 So. 2d 776.

There can be no doubt but that the Defendants, as of October 1, 1971, were in default under the clear and unambiguous terms of the February 25, 1969, Mortgage Loan Commitment, thereby empowering the Plaintiff to declare the security deposit specified in the Mortgage Loan Commitment as due and owing to the Plaintiff as liquidated damages.

■ In their answer, the Defendants charged that the sum claimed as liquidated damages by the Plaintiff in reality constitutes an unenforceable penalty. When examined under the rules established in the Florida decisions, this claim is seen to be patently without merit.

Preliminarily, it should be noted that the $95,000 liquidated damages provision is equivalent to only two percent (2%) of the face amount of the mortgage loan contemplated by the February 25, 1969, agreement. Additionally, paragraph 18 of the Mortgage Loan Commitment, which dealt with the matter of liquidated damages, expressly recited the "difficulty of ascertaining the amount of damages which would be sustained" by the Plaintiff in the event the Plaintiff did not acquire the loan from the interim construction lender and specified that the Defendants' liability for liquidated damages would become active only in the event that the Plaintiff did not acquire the loan by the expiration date (or in the event that the Defendants defaulted on their obligations prior to the expiration date.)

■ Under Florida law, whether a contractual provision calling for liquidated damages constitutes an unenforceable penalty is a question of law for the court. Pembroke v. Caudill, 160 Fla. 948, 37 So.2d 538 (1948); Hungerford Construction Company v. Florida Citrus Exposition, Inc., 410 F.2d 1229, 1331–1332 (5 Cir. 1969), cert. denied, 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969).

In North Beach Investments, Inc. v. Sheikewitz, 63 So.2d 498 (Fla.1953), the Florida Supreme Court affirmed a trial court judgment authorizing the lessors of real property to retain a security deposit as liquidated damages. Mr. Justice Dickinson stated the relevant facts in the following manner:

"This case involves a 99 year lease entered into on October 14th, 1946, covering two lots in Miami Beach, one of which lots apparently being improved with an apartment building situate thereon, and the other one at the time of the lease being a vacant lot. The lease called for a ground rental of $7,500 per year for the two lots, payable in certain installments. In addition to this ground rental, the lessee was to erect at the lessee's expense or cost before the expiration of the 5th year of the lease a building on the vacant lot, such building to be substantially equivalent in style, quality, and quantity to the apartment building then located on the other lot; and in addition thereto the lessee was to pay all principal and interest payments as they accrued on the then existing mortgage, the principal of which amounted to some $83,250, and all taxes, assessments, and other similar levies made upon the properties involved. There was a provision in the lease for the lessor's joining in any refinancing up to the extent of the existing mortgages hereinbefore mentioned, should the same become necessary, but this was not to cover any mortgage that may have been necessary to have been placed on the property for the construction of the building to be erected by the lessee at his expense on the vacant lot.

"A security deposit of $32,500 was posted to stand as security for the performance by the lessees of all of the terms, conditions, covenants, and agreements in the lease to be kept and performed by the lessees covering both real and personal property. The covenants with relation to this deposit were substantially that if the lease were cancelled, 1) no part of the security fund should be returned to the lessees, nor should the lessors be bound to account to lessees for any part thereof, 2) the lessors could either retain the security fund as liquidated and agreed upon damages, or retain it and apply it towards actual damages sustained by them, 3) no interest should be paid on this security fund, 4) the lessors were not required to keep the fund separate or in a segregated account, 5) neither the security fund nor any part thereof should

ever be applied as rent, and 6) a provision for a gradual return to the lessees of certain portions of the security fund in the closing year of the lease according to a table scheduled therein.

"Paragraph 20 of the lease further provided that upon any default prior to the expiration of the 99 year term 'all security moneys paid to the lessors * * *, at once pass to and become the property of the lessors, not as a penalty or forfeiture, but as liquidated damages to the lessors because of such default by the lessees hereby fixed and agreed upon between the parties hereto, both of the parties recognizing the impossibility of precisely ascertaining the amount of damages that will be sustained by the lessors in consequence of such default, and both parties desiring to obviate any question or dispute concerning the amount of such damages and the cost and effect of such default in consequence of such forfeiture have taken these elements into consideration in fixing and agreeing upon the amount of rent to be paid by the lessees to the lessors'." (63 So.2d at 498–499)

In concluding that the provision permitting the lessors to retain the security deposit did not amount to a penalty, the Court reasoned:

"The damages cannot be easily ascertained. We do not know whether any other lease can be made upon the property which would recompense the lessor by the ground rental payment, the payment of existing mortgage, and taxes upon the property, to say nothing of the erection of a building upon the vacant lot by the lessee at no expense to the lessor, and other similar items. Neither is the amount of the security deposit disproportionate to the rental for the period of 99 years. When everything is taken into consideration, the deposit is not disproportionate even to the 24 years period, including ground rental payments, principal and interest payments on the mortgage, and taxes, and erection of a building substantially equivalent to that on one of the lots leased which old building must have some material value in order to support mortgages to the extent of $83,250." (63 So.2d at 500)

In Hyman v. Cohen, 73 So.2d 393 (Fla. 1954), the Florida Supreme Court permitted the lessor of real property to retain possession of a $25,000 security deposit after the lessee had vacated the premises following an eviction threat based upon the non-receipt of two semi-annual rental payments of $5,000 each. The Court observed that the lease provided for the forfeiture of the deposit only upon the termination of the agreement and not for the mere breach of any one of several covenants of widely varying importance.

In entering into the February 25, 1969, agreement, the Plaintiff, with the Defendants' full knowledge, undertook to segregate $4,750,000 from its assets to be invested in the Normandy Mall project over a year thereafter. It can hardly be disputed that during the period between the date of execution of the agreement and the anticipated closing date, the Plaintiff could have located alternate investment opportunities, the loss of which would give rise to damages to the Plaintiff which, although uncertain in amount, would be at least equal to the $95,000 security deposit involved in this case.

Having determined that the Plaintiff is entitled to prevail with respect to its motion for summary judgment as to the Defendants' liability for liquidated damages, it logically follows that the Defendants' counterclaim for the refund of the $47,500 deposit paid at the time of the execution of the Mortgage Loan Commitment must fail.

## VII. PLAINTIFF'S ENTITLEMENT TO AN AWARD OF ATTORNEYS' FEES

Relying upon Tiernan v. Sheldon, 191 So.2d 87 (4 Fla.App. 1966), cert. discharged, 200 So.2d 183 (Fla.1967), the Plaintiff has made out a persuasive ar-

**320**

gument in support of its claim for an award of attorneys' fees under paragraph 17 of the Mortgage Loan Commitment. Should it be determined that the Plaintiff is entitled to such an award, a trial would be necessary to fix the size thereof. Under these circumstances it is the view of the Court that the issue of the Plaintiff's entitlement to an award of attorneys' fees should not be passed upon at this time, but should be deferred until after a trial is had on the attorneys' fees issue.