R. Richard WALKER and Bill W. Weatherford t/a Ypsi-Ann Associates

v.

FIRST PENNSYLVANIA BANK, N.A.

Civ. A. No. 80–2237.

United States District Court,
E. D. Pennsylvania.

July 20, 1981.

Alison Douglas Knox, Philadelphia, Pa., for plaintiffs.

Myron A. Bloom and Nancy R. Grunberg, Philadelphia, Pa., for defendant.

## OPINION

LUONGO, District Judge.

Plaintiffs in this diversity action are the principals in a limited partnership, Ypsi-Ann Associates, formed to develop a shopping center in Michigan. They received a construction loan commitment from defendant First Pennsylvania Bank, for which they paid First Pennsylvania a loan commitment fee. The venture failed when Ypsi-Ann was unable to secure permanent financing for the project. Ypsi-Ann asked First Pennsylvania to refund the loan commitment fee, but it refused to do so. Ypsi-

Ann then commenced this action contending that it is entitled to a refund of all or part of the fee. First Pennsylvania has moved for summary judgment on all seven counts of plaintiffs' complaint; Ypsi-Ann has moved for summary judgment on counts I, VI, and VII.

## I. *Factual Background*

In 1978, Ypsi-Ann undertook to develop a shopping center in Washtenaw County, Michigan. Following the usual practice among developers, Ypsi-Ann sought construction financing from commercial banks to erect the center, and long-term permanent financing from insurance companies and savings institutions after construction. In seeking financing for the project, Ypsi-Ann was assisted by Pennamco, Inc., a wholly-owned subsidiary of First Pennsylvania Corporation, a bank holding company whose principal subsidiary is defendant First Pennsylvania Bank. Part of Pennamco's business was to generate out-of-state loans for First Pennsylvania Bank, which, under the National Banking Act, 12 U.S.C. § 36, cannot have out-of-state branches.

Pennamco's work on the proposed shopping center was performed by Joseph Grosz, a Vice-President in Pennamco's Chicago office. In July, 1978, Grosz forwarded to John Hancock Mutual Life Insurance Company an application for permanent financing of the center. On July 26, 1978, Hancock issued a commitment for a permanent loan of $2,675,000 for the center, for which it charged Ypsi-Ann a loan commitment fee of 2% of the amount of the loan, or $53,500. Hancock's commitment was conditioned upon Ypsi-Ann obtaining construction financing from a lender satisfactory to Hancock. Grosz then sought construction financing from First Pennsylvania.

On October 31, 1978, First Pennsylvania offered construction financing in an amount equal to the permanent financing, in return for a loan commitment fee of 1%, or $26,750. Several terms in the proposed commitment were then negotiated by the parties, and the commitment was finalized on December 18, 1978. First Pennsylvania's commitment was conditioned, inter alia,

upon "[e]vidence of satisfactory compliance with all the terms and conditions of the Permanent Commitment . . . ." Letter of John Jemison, Vice-President, First Pennsylvania Bank, October 31, 1978, ¶ (6)(h), Exhibit "C", plaintiffs' complaint. First Pennsylvania's commitment letter further provided that its 1% fee was "earned" as of the date the commitment was issued, in "consideration of Lender holding itself ready, willing, and able to make the Loan and in further consideration of the substantial services which Lender has rendered," and that the commitment fee was to be retained by First Pennsylvania as "liquidated damages" in the event that Ypsi-Ann failed to close the loan. *Id.* ¶ 4.

On April 9, 1979, Hancock notified Ypsi-Ann that it was cancelling its permanent loan commitment because Ypsi-Ann was in default on several points, and because of changes in the economy which resulted in the proposed loan's failing to meet Hancock's underwriting criteria. Although Hancock, like First Pennsylvania, had a clause in its commitment letter permitting it to retain the commitment fee in the event that the loan did not close, it returned the full commitment fee to Ypsi-Ann upon cancellation. The project could not proceed without permanent financing, and as a result Ypsi-Ann fell into default on its construction loan agreement with First Pennsylvania. As noted above, Ypsi-Ann then requested that First Pennsylvania do as John Hancock had done, return the commitment fee, and when it refused, Ypsi-Ann instituted this action.

Ypsi-Ann has advanced a number of theories to support its contention that it is entitled to recover all or part of the loan commitment fee. These theories are set forth in seven counts, some of which I shall address jointly because they raise similar grounds for relief.

## COUNTS I and VI

In counts I and VI of the complaint, Ypsi-Ann contends that under the terms of its commitment letter, First Pennsylvania was bound by the actions of the permanent

lender, John Hancock, in cancelling the permanent financing, and bound by Hancock's "choice of remedy" in the event that the loan did not close. Ypsi-Ann contends that First Pennsylvania and Hancock were in effect co-venturers, and that First Pennsylvania's refusal to refund the loan commitment fee must be evaluated in light of the actions of Hancock.

Ypsi-Ann's theory in this regard is a contractual one, which turns upon the terms of the commitment letters issued by First Pennsylvania and by Hancock, and the legal effect to be given to them. The construction to be given the purported contract is an issue for the court to decide as a matter of law. *Haskins v. Point Towing Co.*, 421 F.2d 532 (3d Cir. 1970), *cert. denied*, 400 U.S. 834, 91 S.Ct. 68, 27 L.Ed.2d 66 (1970); *Associated Hardware Supply Co. v. Big Wheel Distributing Co.*, 355 F.2d 114 (3d Cir. 1965).

In support of its theory that First Pennsylvania and Hancock should be considered as co-venturers in financing the shopping center, Ypsi-Ann first relies upon the language of the respective loan commitments. Ypsi-Ann points out that each lender conditioned its loan commitment on Ypsi-Ann's obtaining a loan commitment from the other; First Pennsylvania's commitment letter conditioned the loan upon a buy-sell agreement between itself and Hancock, whereby Hancock would discharge Ypsi-Ann's debt to First Pennsylvania upon completion of construction; both commitment letters provided for a loan commitment fee which was non-refundable in the event that the loan did not close; and both commitment letters required Ypsi-Ann to pay all incidental expenses in connection with processing the loan application. I disagree with Ypsi-Ann that the similarities and cross-references in the letters have any legal significance.

As Ypsi-Ann concedes, the clauses which it cites in the respective commitment letters were standard in the banking industry.

*See First National State Bank v. Commonwealth Federal Savings and Loan Association*, 610 F.2d 164 (3d Cir. 1979). Therefore it is hardly surprising that the commitment letters are similar, any more than it would be surprising to learn that many different landlords employ the same standard form lease. Likewise, the fact that First Pennsylvania named John Hancock as the permanent lender in its commitment letter is hardly unusual, because Hancock had already made its commitment as permanent lender before First Pennsylvania was approached as the construction lender, and Ypsi-Ann does not dispute that it is standard practice for both the construction and permanent lender to condition their respective commitments on the borrower's compliance with the terms of the other lender.

Ypsi-Ann attaches special significance to the buy-sell agreement in First Pennsylvania's letter whereby Hancock agreed to "purchase" the loan from First Pennsylvania upon completion of construction on the project. I accept First Pennsylvania's contention that rather than establish a joint venture between Hancock and First Pennsylvania, the buy-sell clause establishes that there were two independent lenders concerned with separate phases of the project. The purpose of the buy-sell clause was clearly to allow First Pennsylvania to terminate its involvement in the shopping center once construction was finished. Rather than involve First Pennsylvania and Hancock in the project jointly, the buy-sell arrangement was the means by which First Pennsylvania's role as mortgagee would be assumed by Hancock.[1]

In short, the similarities between and cross-references in the commitment letters reflect nothing more than that First Pennsylvania and Hancock pursued similar, albeit different, investments in the same project, and followed standard industry practice in doing so.

---

1. The need for conditions relating to permanent financing is obvious. Unless the construction lender is assured that the borrower has permanent financing committed for when construc-

tion is finished, the construction lender would find itself locked into a long-term commitment which it did not bargain for.

The closest nexus between First Pennsylvania and Hancock during the transaction was that it was Pennamco, a subsidiary of First Pennsylvania Corporation, the bank's parent company, which approached Hancock to be the permanent lender. Ypsi-Ann does not contend that Pennamco gave it poor business advice in seeking financing from Hancock, nor does it contend that First Pennsylvania would be liable for the mistakes of an affiliated company even if Pennamco could be criticized for its choice of Hancock as the permanent lender. Furthermore, Ypsi-Ann does not claim that there was collusion between Hancock and First Pennsylvania, or that First Pennsylvania in any way influenced Hancock to withdraw its commitment. On the contrary, Ypsi-Ann concedes that it was in technical default on the terms of the commitment at the time Hancock cancelled. Ypsi-Ann simply contends that since Hancock refunded the commitment fee after cancellation, and since Hancock caused the project to falter, First Pennsylvania is bound to demonstrate its "good faith" by refunding its fee as well.

In this regard, Ypsi-Ann points out that it was not to blame for the failure of the loan to close; that loan commitments are frequently renegotiated to allow for necessary flexibility in real estate development projects; that First Pennsylvania's funds were never at risk; and that retention of the fee is a windfall to First Pennsylvania. These "arguments" by Ypsi-Ann are little more than expressions of its dissatisfaction with First Pennsylvania's hard-line business practice, and like its contentions regarding the language of the commitment letters, lack any legal significance. It is undisputed that both Hancock and First Pennsylvania provided in their respective commitment letters for a non-refundable loan commitment fee. But the contracts were totally separate, and the fact that Hancock chose not to enforce its rights under its contract simply has no bearing upon First Pennsylvania's rights under the bank's contract with Ypsi-Ann.

In conclusion, it is plain from the record that First Pennsylvania and Hancock were not co-venturers, but entered into separate contracts with Ypsi-Ann. It is also plain that First Pennsylvania's contract with Ypsi-Ann provided that its commitment fee was earned upon issuance of the commitment letter, and further provided that First Pennsylvania was entitled to the fee regardless of whether the loan was consummated. Accordingly, Ypsi-Ann's motion for summary judgment on counts I and VI will be denied, and First Pennsylvania's motion for summary judgment on those counts will be granted.

### COUNTS II and III

In count II of the complaint, Ypsi-Ann contends that First Pennsylvania did not hold itself "ready, willing, and able" to make the loan for which the loan commitment fee was paid. In count III, Ypsi-Ann contends that the loan commitment fee was paid in return for "substantial services" rendered by First Pennsylvania, but that the bank did not in fact render such services. Each count in essence advances the general proposition that the loan commitment fee is void for want of consideration.

Ypsi-Ann's contention that First Pennsylvania was not "ready, willing, and able" to close the loan is grounded on the fact that First Pennsylvania did not "segregate" funds specifically earmarked for Ypsi-Ann. Ypsi-Ann has not alleged that it is a required or a standard practice in the banking industry to segregate funds once a commitment letter issued, and this purported failure by First Pennsylvania is the only basis for Ypsi-Ann's contention that the bank was unprepared to close the loan. In support of its motion, First Pennsylvania cites the deposition testimony of John Jemison, a Vice-President at the bank, who testified that the bank does not segregate funds for the purpose of standing ready to fulfill its loan commitments, but that sufficient funds were "budgeted" in the bank's annual forecast of commitments to meet its commitment to Ypsi-Ann. (Deposition of John S. Jemison, Dec. 2, 1980, pp. 47–50). Ypsi-Ann has presented no competent evidence to suggest that there is a material issue of

fact with regard to the bank's ability to meet its commitment, and it may not simply rest upon the allegations of the complaint. Rule 56(e), F.R.Civ.P. Therefore First Pennsylvania is entitled to judgment on count II.

■ As to Ypsi-Ann's claim in count III that First Pennsylvania did not render sufficient services to warrant the fee, it is noteworthy that the commitment letter agreed to by Ypsi-Ann referred to "substantial services" which the lender "has rendered," language which seems to be an admission on Ypsi-Ann's part that the bank rendered at least some services to it issuing the commitment. (Jemison letter of October 31, *supra*, ¶ 4). The same paragraph further provides that mere issuance of the commitment would earn the fee. This language is unambiguous, and makes clear the parties' agreement on the value of issuance of the commitment letter to Ypsi-Ann, and the value of the services performed in producing it. Unless Ypsi-Ann contends that it was coerced or misled into agreeing to the terms of the commitment letter, and it has raised no such contention, I am at a loss to understand why it should now be permitted to contend in effect that the bargain it struck with First Pennsylvania over the value of the commitment was not a good one.[2]

Moreover, assuming that there were some legal basis for Ypsi-Ann's third count, it has failed to establish an issue of fact. First Pennsylvania again cites the deposition testimony of Vice-President Jemison in support of its position that substantial services were in fact rendered in return for the commitment fee. Jemison testified that he personally spent over 100 hours in processing the loan application, and that numerous other bank officials and committees spent time in researching and reviewing the application. (Jemison deposition, pp. 52–53). Furthermore, the "services" rendered by First Pennsylvania went beyond the personnel and administrative resources employed in processing the loan application. First Pennsylvania also took the risk that the work it devoted to processing the loan would be wasted, in the event that Ypsi-Ann later sought financing elsewhere, or for some other reason failed to close the loan. And by making a commitment to Ypsi-Ann, First Pennsylvania may have limited its opportunities to make commitments to other prospective borrowers. (Jemison deposition, p. 61). Ypsi-Ann has not presented any evidence creating an issue of fact with regard to the services which First Pennsylvania has shown it rendered, and the record is plain that there was consideration for the commitment fee.

Accordingly, First Pennsylvania is entitled to summary judgment on count III of the complaint.

### COUNT IV

In count IV, Ypsi-Ann appears to advance a claim that the contract between itself and First Pennsylvania was illusory, because First Pennsylvania could void the contract in the exercise of good faith business judgment; First Pennsylvania never advanced any money under the commitment letter; and First Pennsylvania was not "locked into" a fixed rate of interest, but rather received interest at a floating rate calculated with reference to the prime rate on a daily basis.

■ As First Pennsylvania points out, the fact that it did not advance money is irrelevant, inasmuch as the commitment letter did not require it to advance money until all of the terms of the commitment were met and construction commenced. Moreover, First Pennsylvania was committed to a specified rate of interest under the contract, albeit a floating rate. (Jemison letter of October 31, *supra*, ¶ 2). This rate of interest was negotiated by the parties, with the advice of counsel. (Deposition of R. Richard Walker, November 26, 1980, p. 48).

---

**2.** Ypsi-Ann's contention that the services rendered by the bank are worth substantially less than the $26,750 commitment fee is addressed in my discussion of Count V. Counts II and III discussed above are addressed more to the existence of consideration for the fee, whereas Count V seems to address the appropriateness of the amount.

As to Ypsi-Ann's contention that the commitment letter was voidable at the election of First Pennsylvania, there is no support for this claim in the record. The commitment letter itself provided that upon execution of the letter by Ypsi-Ann and tender of the commitment fee, the letter "shall become a binding agreement." (Jemison letter of October 31, *supra*, ¶ 17). It is true that First Pennsylvania could void the agreement in the event that Ypsi-Ann did not fulfill the conditions set forth in the commitment letter, but that does not make the agreement illusory. Rather, it simply makes the contract one in which the obligation of performance by the lender is subject to the fulfillment of conditions precedent by the borrower.

Therefore, there is no basis for Ypsi-Ann's position that First Pennsylvania assumed no obligations under the commitment letter, and First Pennsylvania is entitled to summary judgment on count IV of the complaint.

### COUNT V

In count V, Ypsi-Ann claims that the commitment fee is invalid, contending that the amount does not reasonably approximate the actual losses suffered by First Pennsylvania and is therefore a penalty imposed upon it for non-performance. First Pennsylvania bases its motion for summary judgment on the ground that the fee constituted a valid measure of liquidated damages.

Paragraph 4 of the Commitment letter provided that the commitment fee of $26,750 "has been earned by Lender by issuing this Commitment Letter and shall be retained by Lender as liquidated damages in the event Borrower is unwilling or unable to close the loan." (Jemison letter of October 31, *supra*). The validity of a liquidated damages provisions is a matter of state law. The parties have not discussed whether Pennsylvania or Michigan law is controlling, but rather have cited common law decisions from other jurisdictions.[3]

Without exception, those courts which have considered challenges to the validity of loan commitment fees have upheld them as legitimate forms of liquidated damages. *Shel-Al Corporation v. American National Insurance Co.*, 492 F.2d 87 (5th Cir. 1974) (upholding 3% fee under Alabama law); *Regional Enterprises, Inc. v. Teachers Insurance Annuity Association of America*, 352 F.2d 768 (9th Cir. 1965) (upholding 1.7% fee under Washington law); *Frank's Nursery Sales, Inc. v. American National Insurance Co.*, 388 F.Supp. 76 (E.D.Mich.1974) (upholding 3% fee under Ohio law); *New York Life Insurance Co. v. G.H.C. Properties, Ltd.*, 361 F.Supp. 311 (M.D.Fla.1972) (upholding 3% fee under Florida law). All of these courts employed some variation of the traditional common law test for assessing the validity of a liquidated damages provision, which considers whether ascertainment of damages upon breach would be difficult; whether the amount of damages provided was grossly disproportionate to actual damages probably incurred; and whether at the time of contracting the parties intended the provision as a penalty or as a good faith estimate of uncertain damages.

Ypsi-Ann concedes that there are no cases which directly support its position, but contends that this is a unique case because John Hancock, First Pennsylvania's "co-venturer," returned its commitment fee, thereby creating an obligation on the part of First Pennsylvania to demonstrate its "good faith" by doing likewise. It also contends that First Pennsylvania's services were at most worth $10,000, and that the loan fee was therefore not a reasonable pre-estimate of damages, but rather was a windfall to First Pennsylvania.

As noted above in the discussion of Counts I and VI, there is no merit to the argument that First Pennsylvania is in any way bound by the actions of John Hancock.

---

3. Research of Pennsylvania and Michigan law revealed no cases directly dealing with the va- lidity of loan commitment fees.

As to Ypsi-Ann's contention that the fee was excessive, I note initially that the fee was certainly not disproportionate to the total loan, because it amounted to 1% of the loan principal. Although it may be that the "services" rendered by First Pennsylvania personnel do not have a value of $26,750 when computed at an hourly rate, it is plain that in obtaining the commitment letter Ypsi-Ann received more than simply services. It also received an enforceable promise from the bank to provide the construction loan which made it possible for Ypsi-Ann to proceed with the project. Conversely, First Pennsylvania gave up more than just services: as noted above, by making the commitment to Ypsi-Ann, as Vice-President John Jemison testified, it may have lost the opportunity to make loans to other borrowers. (Jemison deposition, p. 61). It is, of course, impossible to affix a definite value to lost potential business opportunities, but it is precisely because of the difficulty in doing so that the courts have recognized compromise estimates by parties to a contract in the form of liquidated damages provisions. In light of the reasonable amount of the fee in this case, the "value" received by Ypsi-Ann in securing a firm commitment, and the uncontradicted testimony presented by First Pennsylvania that the fee was in part compensation for possible lost opportunities, there is no basis for Ypsi-Ann's claim that the fee was unreasonable.

■ Likewise, there is no merit to Ypsi-Ann's claim that the commitment fee is invalid because it is a penalty. First, the very fact that the fee is for a reasonable amount weighs against a finding that it is a penalty. *In Re Plywood Company of Pennsylvania*, 425 F.2d 151, 155 (3d Cir. 1970); 5 Corbin, Contracts, § 1057, pp. 332–334 (1964). Second, the provision for a commitment fee in this case does not meet the definition of a "penalty" as that term has evolved in contract law. A penalty is fixed " 'as a punishment, the threat of which is designed to prevent the breach,' " *In Re Plywood Company*, 425 F.2d at 155, or, in the words of Professor Corbin, "[p]enalties are said to be *in terrorem* to induce per-

formance as promised." Corbin, *supra*, § 1058, p. 340. The commitment fee in this case by its very nature is not a penalty in the classical sense, because Ypsi-Ann was required to pay the fee regardless of whether the loan closed. By definition the fee was not a deterrent to breach, because First Pennsylvania "earned" the fee merely by issuing the commitment. The provision that the fee was to be retained by First Pennsylvania as "liquidated damages" was in effect the parties' way of saying that the fee was non-refundable. Inasmuch as the parties contemplated at all times that Ypsi-Ann would have to pay the fee to First Pennsylvania as consideration for the bank's issuance of a loan commitment, and came to terms as to the value of the commitment to Ypsi-Ann, $26,750, I am not persuaded that the fee becomes a penalty simply because Ypsi-Ann failed to close the loan. First Pennsylvania's motion for summary judgment on Count V will be granted.

## COUNT VII

■ In Count VII of the complaint, Ypsi-Ann claims that the loan commitment fee was invalid because First Pennsylvania was prohibited by federal banking law from lending construction funds for the project once John Hancock withdrew, and First Pennsylvania should not be permitted to retain consideration for a contract which it could not perform. *See* § 277, Restatement of Contracts (1932).

Ypsi-Ann goes to great length in its motion for summary judgment to demonstrate that under 12 U.S.C. § 371, issuance of the loan to Ypsi-Ann in the absence of a permanent lender prepared to "take out" the loan at the completion of construction would have placed First Pennsylvania in violation of the law governing reserves for commercial banks. As First Pennsylvania points out, regardless of whether Ypsi-Ann's interpretation of § 371 is correct, its argument must fail, because the commitment fee was not consideration for the issuance of funds, but rather for issuance of the commitment letter, and First Pennsylvania had fully per-

formed its obligation in this regard well before Hancock withdrew.

Ypsi-Ann's premise in Count VII is that First Pennsylvania could not advance funds after Hancock's withdrawal. However, as repeatedly noted above, the commitment letter plainly provided that the commitment fee was consideration for issuance of the commitment letter, and was earned once the commitment letter was issued. The commitment letter was agreed to in December, 1978, and Hancock did not withdraw from the project until April, 1979. Since First Pennsylvania had earned its fee as of December, 1978, subsequent events purportedly affecting its ability to advance funds under the contract are irrelevant.

Accordingly, Ypsi-Ann's motion for summary judgment on Count VII will be denied, and First Pennsylvania's will be granted.