**AMERICAN FLETCHER MORTGAGE COMPANY, INC., Plaintiff-Appellee,**

v.

**COUSINS MORTGAGE AND EQUITY INVESTMENTS, Defendant-Appellant.**

No. 79–1063.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 28, 1979.

Decided June 20, 1980.

Evan E. Steger, III, Indianapolis, Ind., for defendant-appellant.

Theodore R. Boehm, Indianapolis, Ind., for plaintiff-appellee.

Before CUMMINGS, Circuit Judge, WISDOM, Senior Circuit Judge,* and CUDAHY, Circuit Judge.

CUDAHY, Circuit Judge.

Plaintiff, American Fletcher Mortgage Company, Inc. (the "Mortgage Company"), a mortgage brokerage concern, brought this action against Cousins Mortgage and Equity Investments ("Cousins") seeking a declaratory judgment that the Mortgage Company had complied with the terms of the parties' participation agreement (as amended). Cousins counterclaimed for damages resulting from the Mortgage Company's alleged breach of the participation agreement and the fiduciary duty it owed to Cousins.

Through the participation agreement, dated June 12, 1973, between the Mortgage Company and Cousins, Cousins participated to the extent of $2,100,000 in a non-recourse loan of $4,200,000 made by the Mortgage Company to Norbeck Development Associates ("Norbeck"), a Virginia limited partnership. Norbeck engaged in the development of the Water Oaks project, a condominium project near Virginia Beach, Virginia. Eighty percent of the remaining $2,100,000 of the mortgage money was allocated to American Fletcher Mortgage Investors ("AFMI") (for which the Mortgage Company acted as advisor) and 20% was allocated to a sister corporation, American

---

* The Honorable John Minor Wisdom, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

Fletcher National Bank & Trust Company ("AFNB"). Norbeck mortgaged the property in question to the Mortgage Company to secure the $4,200,000 loan.[1]

After a series of events generally paralleling the onset of severe economic problems for the Water Oaks development, the Mortgage Company released its mortgage on the land which secured its loan for "Phase I" of the Water Oaks project and brought this action for a declaratory judgment. The district court found that the actions of the Mortgage Company were authorized and valid and not in breach of its contractual obligations and that the Mortgage Company had acted in good faith at all times. Cousins' counterclaim was dismissed.

Cousins argues on appeal that the Mortgage Company violated the amended participation agreement in several ways: (1) by releasing the mortgage on Phase I even though the developer Norbeck, was in default on the loan which the mortgage secured and (2) by paying Cousins the release fee out of the proceeds of a second loan rather than out of the proceeds of sales of condominiums as they were sold. Cousins has not argued on appeal that the Mortgage Company breached its fiduciary duty. We agree with the district court's finding that the release did not violate the amended contract because Cousins waived any objection to the source of payment of the release fee, the timing of the payment and Norbeck's default and, therefore, we affirm the judgment of the district court.

## 1. Facts

For purposes of this analysis, we generally accept the findings of fact of the district court, with certain modifications which will be made clear.

The Mortgage Company has been in the mortgage brokerage business for several years. Its principal business has been to arrange and administer financing for the development and construction of relatively substantial real estate projects. The Mortgage Company does not itself normally provide funds for real estate developers but acquires such funds from large institutional lenders. A lender which contributes to the funds made available to the developer through the Mortgage Company is commonly referred to as a "participant." Each participant enters into a contract with the Mortgage Company (known as a participation agreement) which provides that the latter shall administer the loan, make disbursements, receive payments of principal and interest and so on—all on the participant's behalf.

Cousins is an institution which engages in the business of investing in real estate, and in 1973 Cousins was qualified as a real estate investment trust. Both the Mortgage Company and Cousins are sophisticated and experienced in real estate financing.

### A. The Land Acquisition and Development Loan

In late 1972, Norbeck contacted the Mortgage Company to arrange financing for a condominium project, "Water Oaks," to be constructed near Virginia Beach, Virginia. The plans for the project called for the acquisition of approximately 43 acres on Chesapeake Bay, the development of that land and the ultimate construction of 350 condominium units. The units were to be divided into three phases: Phase I involved 52 garden and townhouse condominiums located along the beach, and Phases II and III each involved 2 high-rise "towers" with a total of 149 condominium units each.

In January 1973, the Mortgage Company agreed to arrange initial financing for Norbeck so it could acquire the land for the project, begin developing the site and begin marketing and sales efforts to "pre-sell" the condominium units. This initial loan provided a sum of 4.2 million dollars for land acquisition and development and was known as the "LA&D" loan.

[1]. The financing transactions involved here concern Virginia real estate encumbered by a deed of trust in favor of the obligee. They substantially comprehend the same relationships as the more common mortgagor-mortgagee situation. Terminology appropriate to the latter will, therefore, be used here throughout.

Later in that same month, the Mortgage Company offered Cousins a 50% participation in the 4.2 million dollar LA&D loan. The Mortgage Company's offering to Cousins was on the same terms as the offering it made to its own affiliate, AFMI, for a share of the same loan. The written participation agreement, dated June 12, 1973, between the Mortgage Company and Cousins recited that Norbeck would not be personally liable for the loan and that Norbeck would pay interest on the outstanding principal of 5½% over AFNB's fluctuating prime rate. The participation agreement also provided that the Mortgage Company would have a right of first refusal to arrange the construction loans for the condominiums and, with respect to any future loans for subsequent construction of the condominium units, the various investors would receive a share of the profits from unit sales in addition to interest and other fees. In the June 12, 1973, participation agreement Cousins accepted a 50% participation in the LA&D loan subject to certain terms and conditions it requested, including the condition that Cousins be offered the right to participate with the Mortgage Company in a later construction loan for improvements on the property in question.

The documents presented to Cousins, upon which its approval of a 50% participation was based, indicated that the principal of the LA&D loan was to be paid down "at a rate of not less than $15,000 per unit." This meant that, until the 4.2 million dollar LA&D loan was completely retired, for each condominium unit constructed and sold, Norbeck would pay at least $15,000 to the Mortgage Company to reduce the principal of the LA&D loan. This mode of loan retirement would have resulted in the LA&D loan's being retired at the time that the first 280 units of the project had been built. In other words, 80% of the units would have borne the cost of the entire $4,200,000 LA&D loan, which had been provided for a 350-unit project.

Although Norbeck was obligated to repay the loan at a rate of at least $15,000 per unit constructed, no price for the *release* of the mortgage encumbering the property was set. Thus when the LA&D loan closed on February 20, 1973, the release of the mortgage was a matter for future negotiation between the Mortgage Company and Norbeck.

Similarly, the participation agreement between the Mortgage Company and Cousins did not establish the conditions under which the Mortgage Company could release the mortgage. Thus, paragraph 8 of the agreement states that the Mortgage Company may not release the collateral securing the LA&D loan (or take certain other actions) without Cousins' "prior written consent," but it does not set a release price. Paragraph 5 of the Agreement provides for the Mortgage Company to perform a number of routine loan administration functions, including acceptance of payments of the note from Norbeck and execution of satisfaction of mortgage documents, without first obtaining Cousins' consent.[2]

---

2. Paragraph 5 of the participation agreement provides as follows: "Lender shall service the Loan and shall perform the following duties without charge to Participant:

(a) Disburse all future advances under the Loan in accordance with the Development Loan Agreement;

(b) Collect and receive all amounts of principal and interest and all other sums and fees that from time to time may be due under the provisions of the Note and any and all other Mortgage Documents. Lender shall remit, within seventy-two (72) hours of receipt, to Participant its pro rata share of all such sums due Participant in accordance with Participant's Interest in the Loan, including Participant's share of the interest and annual com-

mission on the Note, which interest and commission shall be earned on the outstanding advances and payments made hereunder by Participant during the term of the Note, and the origination fee paid at closing;

(c) Keep proper books of account and records reflecting the Interests of Lender and Participant in the Loan, which books and records shall be available for inspection by Participant at all reasonable times during business hours;

(d) Accept payments of the Note in accordance with its terms and execute a proper satisfaction or assignment of the Mortgage Documents, in which event Lender shall pay over to Participant its pro rata share of any such payments based on Participant's Interest;

### B. *The Construction Loan*

In the fall of 1973, plans for construction at Water Oaks of the first 52 condominium units (Phase I) were near completion. These 52 units would occupy approximately 20% of the project's 43 acres and construction was financed by a second loan arranged by the Mortgage Company known as the construction loan. Pursuant to the terms of the construction loan agreement the Mortgage Company advanced $2,900,000 to Norbeck for construction and related purposes, including $780,000 budgeted to retire part of the LA&D loan. The $780,-000 would provide a pay-down of $15,000 per unit for the 52 units of Phase I.

In its October 4, 1973, letter of commitment for the construction loan, the Mortgage Company agreed to make the 2.9 million dollar loan to Norbeck at an interest rate of 5% over AFNB's fluctuating prime rate. This commitment letter specifically provided for principal retirement payments on the LA&D loan and a release price of $15,000 per unit on the LA&D loan. Norbeck executed the commitment letter on October 16, 1973, and agreed to the $15,000 release fee. Thus, *as between the Mortgage Company and Norbeck*, the Mortgage Company was obligated to release the mortgage securing the LA&D loan on payment of the $15,000 per unit fee if Norbeck were not in default at the time of payment.

\* \* \* \* \* \*

(g) Advance for the pro rata account of Participant such funds as may be necessary for insurance premiums, real estate taxes, water charges and similar items, or for the perservation [sic] of the Property, unpaid by the Borrower (in which event Lender shall immediately advise Participant of the nature, amount, and necessity of such disbursement and of the status of Borrower's compliance with the terms of the Loan and Participant shall immediately reimburse Lender its pro rata share of such advances); and

(h) Distribute to Participant copies of all reports, statements and accounts submitted by the Borrower or by others on its behalf."
Paragraph 8 of the Participation Agreement provides as follows: "Lender shall not, without the prior written consent of Participant:

(a) Make or consent to any alteration or amendment of the terms of the Note, the Mortgage, or any Mortgage Documents or

However, Cousins and the Mortgage Company had not yet agreed to a release price.

At about this same time, an officer of the Mortgage Company communicated with an officer at Cousins offering Cousins a 50% share of the 2.9 million dollar construction loan. The offering papers presented to Cousins disclosed that $15,000 per unit, or $780,000, would be paid out of the construction loan to reduce the outstanding principal balance of the LA&D loan. The construction loan participation offering also stated in the first paragraph on the first page: "[T]he security consists of approximately 10 acres located in Virginia Beach, Virginia, on which 52 condominium units are to be constructed." The original LA&D loan documents contemplated that release fees would be paid from the amount obtained at closing of individual unit sales rather than from construction loan proceeds, as the construction loan package indicated. But customarily, as Cousins knew, LA&D loans were repaid with construction loan proceeds. To the extent that a participant in the LA&D loan decided to become a participant, pro rata, in the construction loan, the amount of the release fee would be relatively immaterial since the security would merely be shifted from the support of the LA&D loan to the support of the construction loan.

In October 1973 the Mortgage Company also offered portions of the Phase I con-

other instruments or collateral held by Lender as security for the Loan;

(b) Make or consent to any release, substitution, or exchange of any of the collateral given in regard to the Loan;

(c) Accelerate, except as provision for such acceleration is expressly made in the Note and/or in the Development Loan Agreement between Lender and Borrower, or extend or retard the maturity of the Note;

(d) Sue or foreclose upon the Note, Mortgage, or any other Mortgage Documents;

(e) Waive any claim against the Borrower;

(f) Disburse any proceeds of fire or other insurance covering the Property or any award received as a result of any proceeding involving the condemnation of all or any part of the Property, except as required by the Mortgage; or

(g) Consent to the sale transfer, pledge or assignment of any said collateral or any security in said collateral by Borrower."

struction loan to AFMI and to AFNB in shares of 40% and 10%, respectively, but AMFI declined to participate. In January 1974 Cousins informed the Mortgage Company that it would not participate in the Phase I construction loan for reasons unrelated to the status of the LA&D loan. By refusing to participate in the construction loans, Cousins avoided putting more money into the project. In addition, Cousins received its 50% share of the $780,000 release fee for the LA&D mortgage on the Phase I land.

Since Cousins and AFMI were not participating, the construction loan participants would not be the same as the LA&D loan participants. In fact, AFNB (an affiliate of the Mortgage Company) picked up all of the Phase I construction loan.

Because of the major divergence in participation between the LA&D and the construction loans, it was difficult to provide an equitable and mutually acceptable means to free the security from the LA&D loan to support the construction loan. Payment to the LA&D lenders of a release fee from construction funds could accomplish this objective and was common practice in the industry. The district court found that the construction loan offering to Cousins put Cousins on notice that the LA&D loan was to be repaid from the construction loan proceeds and that the construction lenders would look to the Phase I real estate (including improvements) as security.

### C. January 1974 Payment to Cousins

In January 1974 the Mortgage Company disbursed funds to Cousins from the proceeds of the Phase I construction loan (pursuant to the terms of the construction loan) to pay down the principal of the LA&D loan. At the time of payment, Norbeck was not in default with respect to any obligation under the LA&D loan. The $780,000 represented, as agreed between Norbeck and the Mortgage Company, a release fee of $15,000 per condominium unit in Phase I. The Mortgage Company apportioned the $780,000 among the participants in the LA&D loan as their interests appeared.

On the basis of its 50% share of the total LA&D loan, Cousins was to receive $390,-000. From this the Mortgage Company deducted $60,377.55, which was Cousins' unfunded 50% share of disbursements recently made by the Mortgage Company on the LA&D loan. Hence, the Mortgage Company wired Cousins $329,622.45, and this amount was reflected on Cousins' books as a reduction in the outstanding principal of its participation in the LA&D loan. Cousins apparently raised no question at the time as to whether the payment was merely an agreed-upon repayment of the loan or whether it was a release fee for the mortgage on Phase I.

At the time these funds were wired to Cousins, personnel at the Mortgage Company made a telephone call to Cousins. Even though there is no direct evidence of the content of the telephone message, the district court found that this contemporaneous telephone call informed Cousins that the payment represented Cousins' share of the release fee of $15,000 per unit. It was, as noted *supra*, relatively common practice for construction lenders to make land-loan paybacks for the purpose of clearing the security for the subsequent construction loan. As will be seen, we do not find it necessary to decide whether the district court was correct in concluding that Cousins considered the $15,000 payment a release fee since Cousins' later claim for more money as a release fee was compromised in an amendment to the participation agreement.

From January 1974 until July 1974, Cousins raised no objection to the amount of funds received from the Mortgage Company which were entered on its books as a payback of principal. Throughout this period, Cousins continued to fund its 50% share of disbursements to Norbeck from the LA&D loan by the Mortgage Company. The district court found that new personnel at Cousins, who were responsible for the Water Oaks project, believed that the Phase I land had been released as security for the LA&D loan in exchange for the January 1974 payments of $15,000 per unit. Cousins

was informed that Norbeck was in the process of beginning construction of the additional 144 units of Phase II, for which the land lenders would receive a further paydown on principal at a rate of $15,000 per unit, or an additional $2,160,000.

Beginning in April or May of 1974, certain "trouble shooters" at Cousins began to review Cousins' loans. In June 1974, John Barge, an employee of Cousins, wrote to the Mortgage Company requesting a copy of any deed which released the Phase I acreage, documentation of the computation of the release price and information about the amount paid by Norbeck. In this letter, Barge reminded the Mortgage Company that the terms of the participation agreement provided that the collateral securing the LA&D loan could not be released until Cousins gave its written consent.

The Mortgage Company informed Cousins that no documents had been filed formally releasing the Phase I acreage from the LA&D mortgage since formal release ordinarily took place only at the time each condominium unit was sold in order to (1) avoid multiple recording costs under Virginia law and (2) insure that the property released (i. e., the individual condominium unit) was accurately described. This correspondence was subject to two interpretations: (1) that the release of security as a matter of substance was being questioned by Cousins, or (2) that the release of security as a matter of public record was being questioned by Cousins.

Upon learning in July 1974 that Phase I had not been formally released of record, Cousins objected for the first time to the $15,000 per unit "release fee." Cousins and the Mortgage Company conducted negotiations wherein Cousins sought to have the Mortgage Company buy out its interest in the LA&D loan, which then amounted to almost 1.3 million dollars. The Mortgage Company declined.

The district court found that from July 23, 1974, to early 1975, Cousins raised various objections and attempted to impose requirements upon the Mortgage Company in an effort to induce the Mortgage Company to purchase Cousins' interest. Cousins contended that a $15,000 per unit release fee for Phase I was too low because the value of the land involved in Phase I was greater than the value of the rest of the land covered by the LA&D mortgage. Cousins also raised the matter of cost overruns and expressed a desire to record a document evidencing its 50% interest in the LA&D loan. It abandoned this effort when it was advised that such efforts might make it liable to Norbeck.

Cousins also planned to demand foreclosure by the Mortgage Company on the LA&D loan if a default on interest, which was then accruing at 17½%, was not soon cured. Cousins apparently believed that by demanding foreclosure it would cause the Mortgage Company to buy Cousins' interest in the LA&D loan in order to protect the investment of the construction lender, AFNB, in Phase I. In the latter part of 1974, meanwhile, Norbeck proposed a change in the configuration of some of the later phases of the project, and the Mortgage Company agreed that these revisions justified a reconsideration of the release price per unit on the Phase I property.

### D. *Amendment of the Participation Agreement*

On January 20, 1975, Cousins indicated to the Mortgage Company that it would agree to a release of Phase I land and improvements at a unit price of $20,000 instead of $15,000. At first Cousins demanded that the additional release fee on Phase I be paid to the LA&D lenders in a lump sum rather than out of the proceeds of sale of the units, but the Mortgage Company insisted that the additional $5,000 per unit be paid only when the units were sold. Also on February 28, 1975, Cousins executed an amendment to the contract contained in a letter received from the Mortgage Company dated February 18, 1975, but conditioned its execution on lump-sum payment of the release fees for *future* phases of condominium construction at the time construction loans for those phases were closed. This condition was then unacceptable to the Mortgage Company.

On March 13, 1975, the Mortgage Company sent another letter agreement to Cousins which provided that the additional $5,000 per unit release fee would not be required from Norbeck until the sale of the unit involved, at which time the funds from sale proceeds would be available for that purpose. The district court found that the Mortgage Company's insistence on this requirement was based upon (1) Norbeck's inability to produce the additional money at that time and (2) the Mortgage Company's reluctance to lend an additional $260,000 to pay down the LA&D loan and its belief that other lenders would not put additional funds into the project.

Cousins executed the letter dated March 13, 1975, on March 17, 1975. In this letter agreement, the Mortgage Company and Cousins acknowledged that the terms of the participation agreement between the Mortgage Company and Cousins would "remain in full force and effect, free of breach or default." The letter also stated that it would serve as Cousins' "prior written consent" within the meaning of Paragraph 8 of the participation agreement "as the same may relate to any documentation and release of security necessary to effectuate the sale of individual condominium units."

On March 1, 1975, Norbeck failed to pay the interest due on the LA&D loan. This event of default was not only known to Cousins when it occurred but was pointed out to the Mortgage Company in letters by Cousins shortly thereafter. Thus, the March 13, 1975, agreement was executed when both parties knew that Norbeck was already in default with respect to its obligations under the LA&D loan.

On May 7, 1975, Cousins demanded that the Mortgage Company accelerate the debt and foreclose the LA&D loan because Norbeck, had defaulted. Cousins also contended that Norbeck was not entitled to a release of the Phase I security because it was in default on the LA&D loan. Telephone calls, correspondence, and face to face meetings between representatives of Cousins and the Mortgage Company ensued, at which Cousins renewed its demand for foreclosure. The district court found that Cousins' demand was the outcome of the "strategy" formulated by Cousins six months earlier. The Mortgage Company concluded that foreclosure would be harmful to the project and the interests of all participants, but it agreed to examine Cousins' demand in light of Cousins' contention that the LA&D loan participants were entitled to retain their first mortgage on Phase I.

### E. Release of the LA&D Mortgage on Phase I

On June 9, 1975, Norbeck agreed to borrow an additional $260,000 from AFNB to pay the LA&D lenders the additional $5,000 per unit release fee immediately. On June 10, 1975, a "deed of partial release" was recorded formally releasing Phase I as security for the LA&D loan. On June 11, 1975, Cousins received the Mortgage Company's check for $130,000 representing Cousins' share of the additional release funds computed on the basis of an additional $5,000 per unit.

The district court found that at all times the Mortgage Company had acted in good faith and its actions were not improperly motivated by any alleged conflict of interest arising from the substantial investment of its sister-subsidiary, AFNB, in the construction loan. Cousins does not dispute these findings on appeal. The district court further found that the investments of LA&D participants would have been virtually worthless if the Mortgage Company had not obtained a lender to furnish the construction funds.

By the spring of 1974 and continuing through 1975 the real estate industry, in general, was "in trouble" and suffered a number of well-publicized difficulties, including very high interest rates and a virtual collapse of the market for resort condominiums in a number of areas. The Water Oaks problem involved efforts by various parties concerned with financing to improve their own positions in a situation in which all were apparently condemned to be losers in the long run.

### 2. *Discussion*

This case involves at bottom the priority for rescue of passengers far at sea in what seemed to be a sinking ship. The ship in question consisted of the Water Oaks condominium project at Virginia Beach, Virginia. And the first passenger in line for rescue appears to have been defendant Cousins, which consistently—and quite understandably—attempted to cut its losses in a deteriorating situation. At Water Oaks there was a total land and development investment of $4,200,000, half of which was provided by Cousins. In addition, there was a $2,900,000 construction loan provided exclusively by a bank affiliated with plaintiff Mortgage Company. At least two other loans—one of $670,000 (for further construction) and one of $260,000 (for the additional release fees) were made in the seemingly vain effort to keep the ship afloat. In the latter part of 1974 and in 1975, the vessel was listing heavily, threatening heavy loss both to the Mortgage Company's affiliated entities and to Cousins. It is extraordinarily difficult to "do justice" where loss-sharing of this magnitude is at stake, and all hands are overcrowding the lifeboats.

One of the obvious problems here is that the draftsman of the participation agreement for the LA&D loan may have contemplated that the two parties to this agreement, or their affiliates, would continue to be partners in financing the joint venture. Both would ordinarily have been expected to participate (as a privilege rather than a duty) in the construction financing as well as in the land acquisition and development financing.

Had such participation continued, neither the Mortgage Company nor Cousins would have been much interested in the amount of funds required to be paid by Norbeck to obtain a release of the property from the lien of the land acquisition and development mortgage. Such a release was necessary in order to provide the construction financers

with a first mortgage on the property. Had Cousins occupied as significant a position in construction lending as it did in land lending, a release of the land acquisition mortgage would merely have moved it from the position of first mortgagee as land acquisition lender to a position of first mortgagee as construction lender. When, however, Cousins declined (as was its right) to participate in the construction financing, it naturally developed a burning interest in obtaining as high a release fee as possible or, if possible, no release at all from the lien of the land acquisition and development mortgage.

The Mortgage Company, on the other hand, by reason of Cousins' non-participation as a construction lender, developed a strong interest in the release of the land acquisition and development mortgage at as low a price as possible in order to buttress the position of its affiliated bank as the residuary construction lender.

Here the participation agreement does not specifically address the circumstance presented by a participant in the land acquisition loan's declining to take part in the construction loan. Nonetheless, the district court has acted appropriately in attempting to construe the participation agreement (as amended) in these circumstances, and we agree generally with the conclusions reached by the district court in an eventuality perhaps not fully anticipated by the parties.

On appeal Cousins argues that the district court erred in concluding that the participation agreement, as modified by the letter agreement, authorized the release of the LA&D mortgage on Phase I in the circumstances of the instant case and therefore was not breached. Cousins also disputes the district court's interpretation of the January 1974 payment.[3]

### A. *Release of the LA&D Mortgage*

Cousins argues that under the terms of the participation agreement four require-

---

**3.** The parties appear to have assumed that the participation agreement and the letter agreement are governed by Indiana law (although they occasionally cite cases from other jurisdictions) so we shall follow this approach.

ments must have been met before the LA&D mortgage on Phase I could be released:

(1) Cousins and the Mortgage Company had to agree on a release price,

(2) Norbeck could not be in default on its interest payments on the LA&D loan,

(3) each unit on which the mortgage was to be released had to be sold and

(4) Cousins had to give the Mortgage Company its prior written consent to the release.

Cousins admits that the letter agreement of March 13, 1975, established a release price, and we agree with the district court's conclusion that the letter agreement constituted Cousins' prior written consent because it stated that

"This letter shall further act as your Company's [Cousins'] prior written consent as provided in paragraphs 8A and 8B of the Participation Agreement, as the same may relate to any documentation and release of security necessary to effectuate the sale of individual condominium units."

Thus two of the four requirements were clearly satisfied by express terms of the letter agreement.

The letter agreement also provided that "Except as may be modified hereinabove, the terms of our Participation Agreement will remain in full force and effect, free of breach and default." Cousins argues that the Mortgage Company breached the amended agreement because Norbeck was in default on its interest payments when the mortgage was released.[4]

However, the district court found that "On March 1, 1975, as [John Logan of Cousins] had anticipated, Norbeck failed to pay the interest due on the LA&D loan. The event of default was not only known to Cousins when it occurred, but was pointed out to the Mortgage Company in letters by Cousins shortly thereafter." (Finding of Fact No. 38.)

The court also found that Cousins contemplated default because in negotiations it argued that it was entitled to a higher release fee on the grounds that Norbeck had not set aside enough money to meet the interest payments due on the LA&D loan and would soon be in default. (Finding of Fact No. 36.) Cousins does not dispute these findings of fact and does not invoke the parol evidence rule although it contends that interpretation of the contract language is a question of law.

In determining the intention of the parties to a contract a court may consider the circumstances which existed when the contract was made. It may also consider the nature of the contract and its subject matter and the apparent purpose of making the contract. *Standard Land Corporation of Indiana v. Bogardus*, 154 Ind.App. 283, 317–18, 289 N.E.2d 803, 823 (1972). In the instant case the parties agree that they intended, by entering into the letter agreement, to resolve any remaining issues relating to the conditions under which the mortgage on Phase I could be released. Thus, the letter agreement established a release fee of an additional $5,000 per unit and was to serve as Cousins' prior written consent. However, these provisions would be meaningless and the parties' apparent intent to resolve the release issue would be frustrated if Cousins retained the right to demand foreclosure or withhold its consent to the release because of a default which occurred prior to the execution of the letter agreement. It is implausible that the Mortgage Company would bargain for release of the mortgage in consideration of an additional $5,000 per unit release fee payment without an understanding as to presently existing and widely anticipated facts respecting default. Cousins and the Mortgage Company both understood that Norbeck was in de-

---

4. In making this argument, Cousins assumes that the phrase "free of breach or default" means "free of *Norbeck's* default" but we are not fully persuaded that this interpretation is correct. This language could also mean "free of the *Mortgage Company's* breach or default under the participation agreement." Norbeck's default would seemingly be irrelevant if the latter interpretation were adopted because the participation agreement does not provide that the Mortgage Company could not release the mortgage if Norbeck were in default.

fault with respect to interest payments and was likely to commit other acts of default in the future.

■ In view of the district court's findings of fact concerning Cousins' reasons for demanding a higher release fee and its knowledge of Norbeck's default, we conclude that Cousins entered into the letter agreement of March 13, 1975, with the understanding that there was a present default of interest payments which had been anticipated for several months. Hence, Cousins waived any right which it might have had to object, on the basis of default of interest payments, to release of the mortgage on Phase I.

■ Finally, Cousins vigorously objects to construing the payment to it by the Mortgage Company of $130,000 on June 11, 1975, as a proper, full and final payment of the $20,000 per unit release fee for Phase I because the Phase I units had not been sold and the letter agreement of March 13, 1975, provided that release fees were to be obtained from the proceeds of individual unit sales rather than prepaid out of funds from another loan. The district court found that

"Neither Cousins nor the Mortgage Company understood the March letter agreement to prevent the Mortgage Company from accepting the additional release fees from Norbeck and recording a release [of the LA&D mortgage on Phase I] before unit sales, if Norbeck obtained the money to do so. Cousins had requested and still desired payment as soon as it could get it." (Finding of Fact No. 41.)

Cousins argues that this finding of fact is clearly erroneous.

We reject this argument because the finding is consistent with the undisputed negotiating history of the letter agreement. Cousins had requested that the additional release fee be paid to the LA&D lenders in a lump sum of $260,000 *prior to sale* of the units with respect to which the money was paid. Obviously, early lump sum payment was more certain than waiting upon the eventual sale of the units. In addition, earlier payment resulted in increased value

redounding to Cousins since interest was not being paid in 1975 on the LA&D loan. The district court found, and we agree, that the provision for payment at the time of sale of the condominium units was for the benefit of Norbeck and the Mortgage Company.

Even if the letter agreement did not permit release prior to the sale of the units, Cousins was not clearly injured by the early payment as such. Cousins argues that the release by the Mortgage Company of the entire Phase I acreage, in the absence of unit sales, "siphoned off" the most valuable portion of the property as security for Cousins' loan, thus elevating the Mortgage Company's sister institution AFNB, from a subordinated to an unsubordinated position with respect to the Phase I real estate. Cousins asserts that, as a result of the release of security, Cousins' remaining secured interest consisted solely of a lien on the remaining undeveloped, less desirable acreage.

This argument might be persuasive were it not for the history of the prior negotiations during which Cousins consistently sought early payment. The business purpose which Cousins in hindsight perceives for payment of the additional release price only out of the proceeds of sale of individual units was not in its mind when it entered into the letter agreement of March 13, 1975. Had Cousins wished to protect itself against what it now claims to have been the detriment of prepayment, it ought to have expressly provided against such a contingency in the letter agreement.

Ordinarily prepayment is to be considered a benefit rather than a burden. In the closely comparable case of *Geary v. Dade Development Corp.*, 29 N.Y.2d 457, 280 N.E.2d 359, 329 N.Y.S.2d 569 (1972), the court held the tender of a release fee before sale of individual properties to be valid. We believe that the essence of the bargain struck between the land lender and the construction lender in the instant case contemplated a unit fee of $20,000 to shift the benefit of the first mortgage on Phase I

from the land lender to the construction lender. Cousins and the Mortgage Company agreed upon this amount; it ill behooves the land lender now to object to an early payment of the monies in the hope that he may be able to retain his first mortgage lien on property which now includes the improvements financed by the construction lender.

■ Hence, since Cousins waived any objection to Norbeck's default in payment of interest payments by reason of its contemporaneous knowledge of such defaults and since the payment of the additional release fee early in a lump sum complied with the letter agreement, that payment discharged the Mortgage Company's obligations as to the release of security under the participation agreement, and no liability to Cousins resulted.

### B. The January 1974 Payment

■ The parties do not dispute the fact that in January 1974 the Mortgage Company paid Cousins a sum amounting to $15,000 per unit out of the proceeds of a construction loan by AFNB to Norbeck. Since there is not evidence of enough facts to estop Cousins from denying that it agreed to accept this payment as a release fee, we do not adopt the district court's conclusion on this point. However, as discussed above, we agree with the district court's conclusion that the June 1975 payment and release complied with the letter agreement, and the letter agreement compromised any remaining dispute over the release fee.[5] Thus we do not need to decide whether Cousins agreed that the January 1974 payment was a release fee.

### C. Conclusion

Since all parties have apparently suffered heavy losses in this storm-tossed project, all perceive inequity, if not iniquity, on the part of the others involved. The survivors struggled for a place in the lifeboats or had to settle for a rubber raft (uninflated). In

general, and at least as to the actions taken pursuant to the letter agreement of March 13, 1975, we agree with the conclusions of the district court.

Affirmed.

---

5. Cousins agrees that the district court's decision was framed in the alternative so that the Mortgage Company could prevail on the basis

of its payment pursuant to the letter agreement regardless of the January 1974 payment. (*See* Cousins' brief, p. 23.)