The LINCOLN NATIONAL LIFE INSUR-
ANCE COMPANY; Provident Life and
Accident Insurance Company; Provi-
dent Mutual Life Insurance Company
of Philadelphia; and Life and Casualty
Insurance Company of Tennessee,
Plaintiffs,

v.

NCR CORPORATION, Defendant.

Civ. No. F 77–26.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

May 23, 1984.

Harlan K. Holly, Fort Wayne, Ind.; Robert P. Johnstone and Daniel W. McGill, Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., for plaintiffs.

Robert J. Parrish, Fort Wayne, Ind., for Life and Cas. Ins. Co. of Tenn.

J. Michael O'Hara and William L. Sweet, Jr., Barrett, Barrett & McNagny, Fort Wayne, Ind., for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court for a decision on the merits. Plaintiffs brought this diversity action seeking damages for losses resulting from an alleged breach of contract. This court having considered the entire record and being duly advised, hereby renders and enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

1. This diversity action was brought by four life insurance companies. Plaintiff, The Lincoln National Life Insurance Company (hereinafter Lincoln), is organized under the laws of the State of Indiana and has its principal place of business in the State of Indiana. Plaintiff, Provident Mutual Life Insurance Company (hereinafter Provident Mutual), is organized under the laws of, and has its principal place of business in, the State of Pennsylvania. Plaintiffs Provident Life and Accident Insurance Company (hereinafter Provident Life) and Life and Casualty Insurance Company of Tennessee (hereinafter Life and Casualty), are organized under the laws of the State of Tennessee and have their principal places of business in that state. Defendant, NCR Corporation (hereinafter NCR), is a Maryland corporation with its principal place of business in the State of Ohio.

2. The amount in controversy, exclusive of interest and costs, exceeds the sum of $10,000 (Ten Thousand Dollars).

3. Diversity jurisdiction is invoked under 28 U.S.C. § 1332.

4. This action arises out of a "Mortgage Loan Commitment Letter" (hereinafter loan commitment letter) issued by plaintiff Lincoln as the lead lender for itself and on behalf of the other plaintiffs. The loan commitment was sought by defendant NCR through the services of a mortgage broker, United California Mortgage (hereinafter UCM), for the purposes of financing the construction of NCR's world headquarters building in Dayton, Ohio. NCR agreed to pay UCM a fee of one-half of one per cent (½ of 1%) of the principal amount of the loan for use of UCM's services.

5. The determination that UCM should secure loans for construction of the project occurred after NCR determined that competitive bidding should not be undertaken. Rather, UCM would undertake the project of putting together the best loan package for financing NCR's new headquarters building.

6. Throughout the relevant period, UCM operated as an intermediary between the parties to this action and in such capacity arranged the participation amounts of the parties, the loan terms, and interest rates.

7. In an effort to insure that UCM could act for NCR in the transaction, plaintiff Lincoln requested and received a $50,000 good faith deposit. The plaintiffs then secured approval for the loan from their respective loan committees. Following loan committee approval, each plaintiff placed the NCR loan on its cash flow chart. These charts list investments to be funded

at certain dates in the future and are used to predict future cash needs.

8. Assured that UCM had control of NCR's business, plaintiff Lincoln, as lead lender, drafted a loan commitment letter and circulated it among the other three plaintiffs for review. Upon receipt of the draft, Mr. Craig L. Snyder, Vice President in charge of mortgage loans of plaintiff Provident Mutual, suggested to Lincoln that a one per cent (1%) fee also be obtained from NCR to secure the deal. Notwithstanding this suggestion, the plaintiffs agreed to the proposed loan commitment.

9. By date of November 5, 1975, Charles Marcus, Administrative Manager of plaintiff Lincoln, on behalf of plaintiffs, signed the Mortgage Loan Commitment letter in Fort Wayne, Indiana and sent the same to NCR in Dayton, Ohio for signature. On November 17, 1975, Robert C. James, NCR's Director of Financial Planning and Analysis, accepted the loan commitment letter subject to certain proposed amendments.

10. The loan commitment document as executed by NCR ended as follows:

THE UNDERSIGNED HAS READ, APPROVED AND ACCEPTED * THE FOREGOING MORTGAGE LOAN COMMITMENT, INCLUDING THE GENERAL CONDITIONS AS OF THIS 17th DAY OF November, 1975.

NCR CORPORATION
By: /s/ D.L. McIntosh
(Name) (Title)
D.L. McIntosh, Vice
President, Finance

* Subject to Amendments enclosed with Mr. R.C. James' November 17, 1975 letter to C. Marcus.

(Plaintiffs' Exhibit 1).

11. The amendments proposed by NCR were accepted by plaintiffs on January 20, 1976 when Charles Marcus of plaintiff Lincoln executed the acceptance. Mr. Marcus then sent a letter to Mr. James of NCR stating, "it is agreed and understood that the mortgage loan commitment as amended is now acceptable to all parties involved in the transaction." (Plaintiffs' Exhibit 14).

12. The mortgage loan commitment provided that the plaintiffs would jointly loan up to $14,000,000 (Fourteen Million Dollars) unless the total capitalized costs of the project were less than that amount. Plaintiff Lincoln agreed to loan $5,000,000 (Five Million Dollars) or 35.7%, plaintiff Provident Life $4,000,000 (Four Million Dollars) or 28.6%, plaintiff Provident Mutual $3,000,000 (Three Million Dollars) or 21.4% and plaintiff Life and Casualty $2,000,000 (Two Million Dollars) or 14.3%. The interest rate for the loan was fixed at 9⅞% for a term of twenty-five (25) years with prepayment closed for ten years and a prepayment penalty thereafter.

13. In the loan commitment letter, NCR "agree[d] to take the loan funds down no later than the fourth quarter of 1976." (Plaintiffs' Exhibit 1).

14. The loan commitment letter further required that certain conditions be met by defendant NCR. These conditions included transfer of the real estate upon which the headquarters were to be built to a subsidiary, lease of the building to NCR and assignment of the lease and mortgage to plaintiffs as security for the loan.

15. On November 19, 1975, the Board of Directors of NCR adopted a resolution which authorized the officers of NCR to establish a real estate subsidiary to own the land and buildings for the new headquarters. This subsidiary, NCR Realty, was authorized to execute its note and mortgage to plaintiffs-lenders, and further authorized to assign the lease to the mortgagee as additional security for the loan.

16. On December 30, 1975, NCR sent UCM $70,000 (Seventy Thousand Dollars) for its services pending determination of the total capitalized costs of construction for the headquarters building.

17. During the first quarter of 1976, NCR noted a substantial increase in its cash balance. Because of this, questions arose regarding the need for external funding of its world headquarters building.

18. Partly in response to the increase of NCR's reserves, NCR's Treasurer, D.W.

Russler, sent a letter to UCM regarding the mortgage loan. The letter included "an amended Letter of Authorization to either renegotiate the mortgage loan for the Headquarters Building or negotiate a reasonable penalty fee for cancelling the commitment." (Plaintiffs' Exhibit 15). The letter indicated that an acceptable loan would be one for $13,000,000 (Thirteen Million Dollars) at 9⅜% interest or alternatively a 1.5% penalty fee. For its efforts, UCM was offered a fee which was on a sliding scale and would increase as the rate of a new loan became less than 9⅜% or as the proposed penalty fee for cancellation became less than 1.5%.

19. Subsequently, on May 10, 1976, Mr. Russler of NCR sent another letter to UCM indicating that the mortgage loan should not be consummated because (1) the interest rate was above that generally found in the market and (2) NCR's need for such financing was no longer evident. (Plaintiffs' Exhibit 17).

20. UCM in turn notified plaintiff Lincoln by letter of May 14, 1976 and attached a copy of Mr. Russler's May 10, 1976 letter.

21. On May 26, 1976 plaintiff-lenders wrote NCR objecting to its decision not to take down the loan. Mr. Russler responded on July 13, 1976 and confirmed that NCR no longer desired to fund the building of the world headquarters by outside sources. The response further indicated that NCR had no legal obligations to the lenders.

22. Following the July 21, 1976 letter from NCR, plaintiff-lenders deleted the NCR loan from their cash flow charts.

23. The mortgage loan from plaintiff-lenders was never made.

24. Construction of NCR's world headquarters building began in 1974 and it was first put into partial use in the fall of 1976. The building was built for the sum of $12,975,931 (Twelve Million Nine Hundred Seventy-Five Thousand Nine Hundred Thirty-One Dollars). Had the loan been closed, it would have been in Dayton, Ohio for that amount.

*Conclusions of Law*

This case presents a variety of legal issues—some rather novel—which must be addressed in order to resolve the controversy between the parties. In an effort to sort out and clarify the issues, the remainder of this judgment will be divided based upon the following considerations. First, because there exists complete diversity between the parties and jurisdiction is properly invoked under 28 U.S.C. § 1332, consideration must be given to a determination of which state's substantive law governs the legal issues. Second, since the parties are in complete disagreement with respect to whether or not the underlying transactions constituted an enforceable contract, analysis of the nature and extent of the agreement is necessary. Finally, consideration must be given to whether or not damages are appropriate and, if so, to what extent. These factors will be considered in turn.

*Conflicts of Law*

 As the foregoing findings indicate, this matter is before the court based upon complete diversity of citizenship and the amount in controversy, exclusive of interest and costs, exceeds the sum of $10,000. Where, as here, subject matter jurisdiction is based upon diversity of citizenship, a federal court must look for guidance in resolving the legal issues to the laws of the state within which it sits. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The law of the forum state includes the choice of law rules used to determine which state's substantive law applies. *Klaxton v. Stentor*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, this court must look in the first instance, to Indiana law for guidance in determining which state's law governs plaintiffs' present claims.

 In contract actions where the transaction touches upon more than one jurisdiction and the parties have not expressed a choice, Indiana follows the "most intimate contact" test to determine which state's law governs the substantive issues in the case. As noted by the Indiana Supreme

Court in *W.H. Barber v. Hayes,* a court in such situations must "apply as the law governing the transaction the law of that state with which the facts are in 'most intimate contact.'" 223 Ind. 570, 63 N.E.2d 417, 423 (1945); *see also Clow Corp. v. Ross Township School Corp.,* 179 Ind.App. 125, 384 N.E.2d 1077 (1979). In determining which state has the "most intimate contact" with the transaction, the Indiana Court of Appeals in the seminal case of *Utopia Coach Co. v. Weatherwax,* indicated that a court should consider the following factors: "the place of the contract; the place of negotiations; the place of performance; the location of the subject matter; and the domicile or place of incorporation or place of business of the parties." 177 Ind.App. 321, 379 N.E.2d 518 (1978). The factors set forth in *Utopia* are quite similar to those in the *Restatement (Second) of Conflicts of Laws* (1971), which provides:

> In the absence of an effective choice of law by the parties ..., the contacts to be taken into account in applying the principles ... to determine the law applicable to an issue include:
>
> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the contract, and
>
> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Restatement (Second) of Conflicts of Laws* § 188(2). The striking parallelism between Indiana case law and the *Restatement* on this issue is beneficial for it aids this court by analogy in applying the "most intimate contact" test to the facts of the case at bar. Consideration of these factors follows.

■ The first factor to be looked at under both Indiana law and the *Restatement* is the place of contracting. As indicated in the *Restatement:*

> [T]he place of contracting is the place where occurred the last act necessary under the forum's rules of offer and acceptance, to give the contract binding effect, assuming, hypothetically, that the local law of the state where the act occurred rendered the contract binding.

*Restatement (Second) of Conflicts of Laws* § 188, comment E (1971). Under this test, it is quite clear that the place of contracting in the present matter was in Indiana. Assuming, for the moment, that a binding contract to borrow was formed, the culminating act occurred in Indiana on January 20, 1976 when Charles Marcus of plaintiff Lincoln approved the proposed amendments on behalf of all plaintiff-lenders and deposited the same in the mail in Fort Wayne, Indiana. *See generally Corbin on Contracts* § 78 (Supp.1982). Thus, with respect to the place of contracting, Indiana had the "most intimate contact" with the subject transaction.

The second factor to be considered is the place of negotiation of the contract. Here, the answer is not quite so clear because negotiations occurred in all concerned jurisdictions. Negotiations occurred in Ohio between NCR and the mortgage broker UCM. Negotiations also occurred in California between UCM and NCR as well as between UCM and the plaintiff-lenders. After the commitment letter had been drafted, negotiations between and amongst the plaintiffs occurred by mail and telephone. Thus, the place of negotiations concededly cannot be narrowed to one jurisdiction. Fortunately, however, "this contact is of less importance when there is no one single place of negotiation ...." *Restatement (Second) of Conflicts of Laws,* comment E at 580.

Under *Utopia* and the *Restatement,* the third factor relevant to a determination of which jurisdiction has the most significant relationship to the transaction is the place of performance. Unlike the place of negotiations, the possibilities here are easily narrowed down to two jurisdictions—Ohio

and Indiana. On the one hand, it could be argued that Indiana law has the "most intimate contact" in relation to the place of performance because it is in that state that the NCR loan payments were to be paid to plaintiff Lincoln as the lead lender. Yet, other factors indicate that Ohio had the most contact. The actual borrowing was to occur at NCR's offices in Dayton, Ohio where the loan would be disbursed upon execution of the documents. It was in Ohio that the loan was to be closed. Thus, taken in balance, it appears that Ohio had the "most significant relationship" to the place of performance.

The fourth factor to be considered is the location of the subject matter. It could be argued that the mortgage and lease described in the loan commitment agreement involved interests in Ohio real estate because defendant NCR was to lease the land back to a subsidiary which in turn would issue a mortgage in favor of plaintiff-lenders. Viewed simply in this light, the location of the subject matter was in Ohio. However, the commitment letter evidenced an agreement to lend and to borrow and it was NCR's reputation which would serve as security, not the World Headquarters Building. As such, the subject matter was not a "specific physical thing." *See Restatement (Second) of Conflicts of Laws* § 188, comment E (1971). Consequently, this court is of the view that no real conclusion regarding which state's law applies can be derived from an analysis of this factor.

The fifth and final factor which must be addressed is the "domicile or place of business or place of incorporation of the parties." *Utopia, supra.* Like the place of performance, the answer is not clear given the various locations and places of business of the parties to this suit. Thus it is impractical, if not impossible, to determine which state has the most significant relationship to the transaction based upon domicile.

The foregoing review of the five factors in the "most intimate contact" test leads this court to conclude that Indiana law should govern the present dispute over the substantive issues.[1] Admittedly, Ohio law could very well govern the substantive issues. Fortunately, and as both parties recognize, however, which state's law governs is of no great moment in this case for it appears that neither the Indiana courts nor the Ohio courts have been presented with the precise issue before this court. Moreover, a decision on the merits must rest upon an interpretation of fundamental principles of contract law.

### The Enforceability of the Commitment

As the above recitation of facts indicate, this case revolves around an agreement to finance construction through use of a mortgage loan. This type of transaction is becoming ever the more popular because "[t]he viability of virtually every major construction project depends upon the availability of long-term financing." R.A. Groot, *Specific Performance of Contracts to Provide Permanent Financing*, 60 Cornell L.Rev. 718 (1975). "[T]he need for conditions relating to permanent financing is obvious," *Walker v. First Pennsylvania Bank N.A.*, 518 F.Supp. 347 (E.D.Pa.1981), for "[i]n an economy plagued by the twin evil of inflation and recession and the burdens which they impose on businesses, long term lending transactions frequently break down." Groot, *supra* at 718; *see also In Re Four Seasons Nursing Centers*, 483 F.2d 599, 601 (10th Cir.1973). Unfortunately, this is a case in which the transactions broke down.

Reduced to its most basic element, this case hinges upon the interpretation given the agreement between the parties. It is plaintiffs' position that the agreement con-

---

**1.** As with the substantive issues, this court is of the view that Indiana law should govern the dispute about damages. This is so because it appears that Indiana courts and federal courts applying Indiana law apply the doctrine of *lex fori* to damages. *See e.g., Stanish v. Polish Ro-* *man Catholic Union of America*, 484 F.2d 713, 721–24 (7th Cir.1973) ("[w]ith respect to the questions of remedies for breach of contract, Indiana courts would apply Indiana law.") *also, Prudence Life Insurance Co. v. Morgan*, 138 Ind. App. 287, 213 N.E.2d 900 (1966).

ferred a mutuality of obligations[2] so that plaintiffs were committed to lend and defendant required to borrow. Defendant suggests that the agreement only committed the plaintiffs to lend had they been called upon to do so. Taking the respective parties' positions together, the issue is obvious: was the agreement relating to the financing of the World Headquarters Building an enforceable contract? The answer, however, is not so obvious.

The difficulty in answering the question before the court stems, in part, from the fact that no other court has apparently addressed the precise issue presented in this case. Most courts which have addressed mortgage loan commitment letters have done so in two different situations. One situation arises where the lender has breached and the borrower sues for damages or specific performance, *see, e.g., First National State Bank of New Jersey v. Commonwealth Federal Savings & Loan Assn.,* 610 F.2d 164 (3d Cir.1980), while the other situation arises where the mortgagor or mortgage broker sues to recover a commitment fee, *see, e.g., In Re Four Seasons Nursing Centers of America,* 483 F.2d 599 (10th Cir.1973).[3] Here, as the facts make clear, it is the borrower who allegedly breached and the lenders who seek damages though no commitment fee secured the agreement. Nonetheless, the existent case law, such as it is, coupled with basic tenets of contract law suggests that the agreement between the parties as plaintiffs urge, constituted a bilateral con-tract instead of the unilateral contract theory advanced by defendant.

The distinction between a unilateral and a bilateral contract is a simple one:

A unilateral contract is one in which no promisor receives a promise as consideration for his promise. A bilateral contract is one in which there are mutual promises between two parties to the contract; each party being both a promisor and a promisee.

*Restatement of Contracts* § 12 (1932). That is, "[i]n the case of a unilateral contract, there is only one promisor; and the legal result is that he is the only party who is under an enforceable legal duty," 1A Corbin, *Corbin on Contracts* § 21 (1963), for a unilateral contract "as its name implies is a one-sided contract while a bilateral contract confers a mutuality of obligations requiring performance on both sides." *Restatement, supra* § 12. *See also High Wheel Auto Parts v. Journal Co. of Troy,* 50 Ind.App. 396, 98 N.E. 442 (1912). Absent "executed consideration," 1A *Corbin,* § 142 at 6 (1963), a unilateral contract confers no mutuality of obligations and hence is an unenforceable obligation with respect to the party who has made no promise. *See Consolidated Laboratories v. Shandon Scientific,* 413 F.2d 208, 212 (7th Cir. 1969).[4]

Defendant argues, as previously noted, that the commitment letter was a unilateral contract because NCR made no promises. Defendant further argues that the commitment letter was, in effect, a unilateral option contract[5] whereby NCR's obligations

---

**2.** The necessity that mutuality of obligations exist in order for a binding contract to be formed has led to two seemingly opposite conclusions by the United States Court of Appeals for the Seventh Circuit. In *Sonnenblick-Goldman v. Murphy,* 420 F.2d 1169, 1173 (7th Cir.1970), the court states that "[a]n enforceable contract requires mutuality of obligation, whereby both parties are bound to perform." Yet one year earlier in *Consolidated Laboratories v. Shandon Scientific,* 413 F.2d 208, 212 (7th Cir.1969), the court indicated that mutuality of obligation, as in the case of a unilateral contract, was not necessary where "executed consideration" exists.

**3.** *See also, Hidalgo Properties v. Wachovia Mortgage,* 617 F.2d 196 (10th Cir.1980); *Plantation Key Developers v. Colonial Mortgage Co. of Indiana,* 589 F.2d 164 (5th Cir.1979); *Stanish v. Polish Roman Catholic Union of America,* 484 F.2d 713 (7th Cir.1973); *Sonnenblick-Goldman v. Murphy,* 420 F.2d 1169 (7th Cir.1970); *Walker v. First Pennsylvania Bank N.A.,* 518 F.Supp. 347 (E.D.Pa.1981); *Weston v. Capano & Sons, Inc.,* 394 F.Supp. 146 (D.Del.1975); *Harding v. Pan Am. Life Ins. Co.,* 452 F.Supp. 527 (E.D.Va.1978).

**4.** *See* note 2, *supra.*

**5.** Though defendant argues that an option can only exist with respect to a unilateral contract,

would only accrue upon its compliance with certain terms expressed in the agreement. Plaintiffs, of course, are of the view that binding promises were made which ultimately culminated in the agreed to commitment letter.

Some authority can be found for both parties' positions. Courts and commentators alike have referred to mortgage loan commitments alternatively as unilateral and bilateral contracts. As stated by one commentator:

It [a commitment letter] can be a unilateral contract: "Upon compliance with the following conditions we will loan you money," or it can be a bilateral contract: "We will lend and you will borrow ...".

Wolf, R., *The Refundable Commitment Fee*, 1968 Bus.Law 1065, 1066. *See also Johnson v. American Nat'l. Life Ins. Co.*, 126 Ariz. 219, 613 P.2d 1275 (App.1980) (option contract); *Dubin Weston v. Louis Capano & Sons*, 394 F.Supp. 146 (D.C.Del. 1975) (bilateral contract). It is, however, not the least bit surprising that commitment letters have been deemed to be either a unilateral or bilateral contract for, as the above passage suggests, it is the language embodied in the instrument which controls and the parties' intention must be gleaned through application of basic tenets of contract law. It is to those basics which the court now turns.

■ Absent illegality, unconscionability, fraud, duress, or mistake, parties are generally free to contract as they desire and are bound by the terms of the contract. *See Broker Title v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174 (3d Cir.1979). In construing a contract so made, "a court's paramount consideration is the intent of the parties." *Mellon Bank N.A. v. Aetna Business Credit*, 619 F.2d 1001, 1009 (3d Cir.1980), *citing O'Farrell v. Steel City Piping*, 266 Pa.Super. 219, 403 A.2d 1319 (1979). It is the objective, not subjective, intent of the parties which controls. *See, e.g., Frigaliment Importing v. B.N.S.*

it is clear that "options" can exist with respect to both unilateral and bilateral contracts. 1A Cor-

*International Sales*, 190 F.Supp. 116 (S.D. N.Y.1960).

■ In determining the parties' intent, "[t]he strongest external sign of agreement between contracting parties is the words they use in their written contract. Thus, the sanctity of the written words of the contract is embedded in the law of contract interpretation." *Mellon, supra* at 1009. And it is settled beyond question that, where one party drafts a document, in subsequent litigation, the document will be strictly construed against the drafting party and in favor of the non-drafting party. *See, e.g.,* Williston, *Williston on Contracts* § 621 (3 ed. 1961); *First National State Bank of New Jersey v. Commonwealth Federal Savings & Loan*, 610 F.2d 164, 170 (3d Cir.1980) (ambiguity construed against drafter-lender).

Turning to the agreement between the present parties, it is clear that the finalized agreement occurred only after several exchanges between Lincoln as the lead lender and defendant NCR. Though this series of offer and counter-offers modified to a greater or lesser extent certain terms in the agreement, it did nothing to ameliorate what defendant deems to be the ultimate pitfall of the agreement: no where does the agreement state that the defendant is required to borrow the money. While the agreement does not, in so many words, explicitly state that "defendant is required to borrow," that requirement is, in plaintiffs' view, implicit within the context of the entire agreement. Particularly important in this regard is the paragraph relating to the date of funding, which reads:

*Funding and Commitment Expiration Dates:* It is understood that construction of the subject building is scheduled for completion during the second half of 1976 and that NCR agrees to take the loan funds down no later than the fourth quarter of 1976. Assuming that construction is completed according to schedule, Lenders will be prepared to

bin, *Corbin on Contracts* § 260.

fund the loan as soon as construction is completed and all of the terms and conditions of this commitment have been fulfilled and would prefer that funding of the loan take place by October 15, 1976. However, in any event, the loan must be funded by no later than December 31, 1976, since this commitment and Lenders' obligations under it shall terminate by that date unless the expiry date is extended in writing by Lenders.

(Plaintiffs' Exhibit 1) and the notation that:

"THE UNDERSIGNED HAS READ, APPROVED AND ACCEPTED [subject to amendments] THE FOREGOING MORTGAGE LOAN COMMITMENT, INCLUDING THE GENERAL CONDITIONS

AS OF THIS 17th DAY OF November, 1975.

> NCR CORPORATION
> /s/ D.L. McIntosh
> (Name) (Title)
> D.L. McIntosh, Vice
> President, Finance"

(Plaintiffs' Exhibit 1).

As has been suggested, the interpretation given to the foregoing passages lies at the very foundation of this litigation. And, of necessity, initial consideration must be given to the language embodied in the document. *Mellon, supra.*

Focusing solely upon the document and applying the rule that it is to be strictly construed against the drafter, defendant suggests that no agreement to borrow can be found. While plaintiffs contend that the phrase "NCR agreed to take the loan funds down no later than the fourth quarter of 1976" means defendant commits itself to borrow the money, defendant urges that this construction is vitiated by the remainder of that paragraph for when that phrase is read in the context of the entire paragraph, it places no obligation upon defendant but merely serves to establish an expiration date for plaintiffs' commitment to make the loan. Similarly, defendant con-

tends that the language referring to acceptance is vague and since plaintiffs drafted the letter, no commitment to borrow should be implied.

To be sure, and as has already been ruled upon by this court in response to defendant's motion for summary judgment, the foregoing phrases are ambiguous and susceptible to more than one meaning. "Certainly there is an ambiguity in the very fact that one of defendant's officers signed the Mortgage Loan Commitment with the notation 'read, approved and accepted.'" (Memorandum of Decision and Order, Feb. 26, 1980 at p. 4). "If, as defendant contends, it regarded the document only as an offer made to it for a unilateral rather than a bilateral contract, in itself, it seems, at the least, ambiguous that defendant would so sign it." *Id.* At the time of entry of the ruling, the court intimated that resolution of this apparent ambiguity could only be cured through the introduction of parol evidence.[6] *See, e.g., Pennzoil v. Federal Energy Regulatory Com'n.,* 645 F.2d 360 (5th Cir.), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982).

As a general proposition, the parol evidence rule bars admission of extrinsic evidence to vary or contradict the terms of an unambiguous written agreement intended by the parties to be an integrated agreement. *See Freeman v. Continental Gin,* 381 F.2d 459 (5th Cir.1967). Where, as here, the written agreement is ambiguous, the parol evidence rule is inapplicable and extrinsic evidence of surrounding circumstances may be admitted to explain an ambiguity. *See Massey-Ferguson v. Bent Equipment,* 283 F.2d 12 (5th Cir. 1960). "In determining the intention of the parties to a contract a court may consider the circumstances which existed when the contract was made." *American Fletcher Mortgage v. Cousins Mortgage,* 623 F.2d 1228, 1237 (7th Cir.1980). "It may also consider the nature of the contract and its subject matter and the apparent purpose of

**6.** "A contract is ambiguous when it is reasonably susceptible to more than one meaning in light of the surrounding circumstances and af-

ter applying established rules of construction." *Watkins v. Petro Search,* 689 F.2d 537 (5th Cir. 1982).

making the contract." *Id.; see also Standard Land Corp. of Indiana v. Bogardus,* 154 Ind.App. 283, 289 N.E.2d 803, 823 (1972).

Evidence extrinsic to the commitment letter indicates that the parties sought to enter into an enforceable contract. With respect to the notation "accepted" as it appeared in the final document, several factors indicate that it obligated NCR to take down the funds.

Prior to finalization of the commitment, the question of whether NCR had an obligation to take down the loan came up in separate discussions among the plaintiffs and among the defendant and UCM. That plaintiffs, and in particular Lincoln, thought defendant was obligated to take the loan is clear. When the original draft of the commitment letter was prepared by Lincoln National and distributed to the other lenders for review, Mr. Craig Snyder of Provident Mutual made a notation which read: "Suggest at least a 1% refundable fee to anchor deal." (Plaintiffs' Exhibit 37). After consultation with Charles Marcus of Lincoln, Mr. Snyder made a further notation: "No fee corporate client & NCR is regarding commitment as contract." (Trial Transcript Vol. I, pp. 197–99).

Though Mr. Snyder made the notation only after consultation with Lincoln and not in response to any contact with NCR (Trial Transcript Vol. II, p. 455), it appears that NCR was also concerned with respect to its obligations. Though it is unclear as to when the issue was raised (see Fraser deposition, pp. 61–62), it is quite clear that concern existed as to what would happen if NCR decided not to follow through with the loan. The question was raised in a telephone conference call between Mr. Robert C. James of NCR and John Fraser of UCM. Also in attendance was a member of NCR's legal staff and a financial analyst of NCR. Despite the fact that the concern was enough to warrant the attendance of a member of the legal department and a member of the financial analysis department, all that could be remembered of the conversation was that the lenders would be "unhappy" if NCR did not go through with the deal. (See Trial Transcript Vol. II, pp. 346–60).

While certainly not dispositive, the fact that NCR expressed concern over the possibility of an anticipatory breach leads to the conclusion that the borrower's freedom to walk away was not as clear as NCR would like this court to believe. In point of fact, other factors suggest an opposite conclusion.

At the time the loan commitment letter was sent to defendant, a request for a one week extension was made so that the commitment letter could be presented to the Board of Directors for authorization. (Plaintiffs' Exhibit 3). At NCR's request, board approval was an express condition of the agreement. Though varying reasons were given for presenting the agreement to the Board of Directors during the trial testimony of Mr. James, a lingering conclusion is that prior to entering into what appeared to be a long term commitment, board approval was a necessity. (See Trial Transcript Vol. II, pp. 360–4).

Still another factor which indicates that the defendant viewed the commitment as a bargained-for contract was the money paid to UCM and the good faith deposit paid to Lincoln. With respect to UCM, NCR paid $70,000 under its brokerage agreement which required payment only after an acceptable commitment had been found:

> "UCM is to receive a fee of ½ of 1% of the principal amount of the loan for its services in arranging a commitment as applied for herein, said fee to be due and payable upon issuance of the commitment from an institutional investor and *acceptance* thereof by NCR as provided below."

(Exhibit 6). (Emphasis supplied). Likewise, the "good faith" deposit of $50,000 was paid to Lincoln which was refunded upon execution of the commitment letter. (See Plaintiffs' Exhibits 10 and 14). According to Mr. Alex Jokay of Lincoln, the deposit was taken to insure that the dealings through UCM were exclusive and that no other bargaining between NCR and an-

other lender was occurring which might thwart the deal. (Trial Transcript Vol. I, pp. 53–55). The payment to UCM and the return of the deposit by Lincoln point, in the court's view, to the conclusion that the parties had agreed upon a contract which was acceptable to both sides and the binding nature of the contract made it unnecessary for Lincoln to retain the good faith deposit.

Taken together, the court is of the view that the parties bargained for, and entered into, an enforceable contract. The bargaining process consisted of offers and counter-offers in which both sides exchanged the terms and conditions which they wished to include in the contract. The upshot of the agreement was one in which the lenders agreed to fund approximately fourteen million dollars at 9⅞% interest for a term of twenty-five years. In consideration of this promise, NCR agreed to take surveys, furnish descriptions, transfer titles, reassign mortgages and the like. (Plaintiffs' Exhibit 1).

In reaching the conclusion that an enforceable contract was entered into, the court is not unmindful of the arguments advanced in opposition by defendant. Particularly worthy of note in this regard are two arguments. First, the absence of a commitment fee suggests that the parties viewed this as a unilateral contract. Second, the lenders did not specifically include language requiring the defendant to borrow though it would have been easy to do so.

With respect to the first argument, it is appealing for one reason—had a commitment fee anchored the deal, the litigation would probably not have arisen and certainly would have been less complex. However, the absence of a commitment fee is not fatal in this case and its absence has been adequately explained. The loan agreement was a financial transaction between institutional lenders and a major domestic corporation. The agreement as struck was a "triple net lease" whereby NCR's credit rating would serve as security for the lease. (Trial Transcript Vol. I, p.

48). While it could be expected that in about three percent of cases a borrower would walk away from such an obligation, (Trial Transcript Vol. I, pp. 63–4, 208) it was virtually unheard of that a borrower of NCR's corporate stature would walk away from such an obligation. Moreover, plaintiffs' assumption that the commitment letter was binding upon all parties further explains the reason behind not requiring a commitment fee. Thus there was no reason to secure the mortgage loan agreement through use of a commitment fee.

In the context of mortgage loan agreements, the reasons for commitment fees are varied. The commitment fee may be intended to constitute liquidated damages, as in *In Re Four Seasons, supra;* or it may serve as a consideration, as in *Regional Enterprises, Inc. v. Teachers Insurance & Annuity Ass'n.,* 352 F.2d 768 (9th Cir. 1965); or it may be given as a stand-by fee as in *Harding v. Pan American Life Ins. Co.,* 452 F.Supp. 527 (E.D.Va.1978). Since consideration has already been found to exist in this case, and since there existed no stand-by lender, the only valid reason for a commitment fee here would have been to serve as a benchmark for liquidated damages. While such an agreed figure would have eliminated much confusion, it adds nothing to the question of whether or not a valid contract had been entered into by the parties. All such a fee would have done in this context would have been to set a price upon NCR's decision to breach the agreement.

Likewise, defendant's second argument does little to detract from the conclusion that the parties entered into an enforceable contract. Had plaintiffs included words to the effect that "NCR agreed to borrow," perhaps this lawsuit would not have developed. But that argument misses the mark for the issue, as indicated at the outset, is whether or not, even absent such language, an enforceable contract existed. The court has already so found. And, it should be noted that "though not at all controlling, the parties are experienced business people who struck what they con-

sidered to be at the time a firm and fair bargain." *Harding, supra* at 528.

Thus far, the court has determined that the parties entered into an enforceable contract and consequently, liability is found in favor of the plaintiffs. There remains the question of damages and it is to that topic which the court now turns.

*Damages*

Having determined that an enforceable contract existed and consequently, that defendant is liable to the plaintiffs for the breach thereof, this court is now in a position to determine what damages, if any, should be awarded plaintiffs. It is plaintiffs' position that the egregious conduct on the part of defendant necessitates an award of substantial damages. Defendant, though maintaining that a contract was never formed, nonetheless argues that even if a contract existed, plaintiffs have no proveable damages.

▮ As has been previously noted, this court is of the view that damages must be assessed in accordance with Indiana law, *Stanish, supra* at 721–24; *Raulausky, supra,* because Indiana courts and federal courts applying Indiana law appear to apply the doctrine of *lex fori* to damages. *See Prudence Life Insurance Co. v. Morgan,* 138 Ind.App. 287, 213 N.E.2d 900 (1966). Consideration of Indiana law which governs damages in this type of action follows.

▮ In order to recover, plaintiffs have the burden of proving that they have suffered damages. *Indiana Bell Telephone Co., Inc. v. O'Bryan,* 408 N.E.2d 178 (Ind.App.1980); *Rauch v. Circle Theatre,* 176 Ind.App. 130, 374 N.E.2d 546 (1978). The damages claimed cannot be based upon conjecture nor subject to uncertainty. *Raco Corp. v. Acme-Goodrich, Inc.,* 126 Ind.App. 168, 126 N.E.2d 262 (1955). With respect to damages for breach of contract, damages are designed to one or more interests of the non-breaching party:

(a) His "expectation interests" which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed;

(b) His "reliance interests" which is his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been had the contract not been made; or

(c) His "restitution interest" which is his interest in having restored to him any benefit that he has conferred on the other party.

*Restatement 2nd Contracts* § 344.

▮ As a corollary to the foregoing, it is absolutely clear that plaintiffs have the burden of mitigating damages. *Rebisso v. Frick,* 94 Ohio App. 45, 108 N.E.2d 282 (1952); *Allen Heaton & McDonald, Inc. v. Castle Farm Amusement,* 151 Ohio St. 522, 86 N.E.2d 782 (1949). "It is usually said that the plaintiff is under a duty to mitigate damages." 11 *Williston on Contracts* § 1353 p. 274 (3d Ed.). "However, the truth seems rather to be that damages which the plaintiff might have avoided with reasonable effort without undue risk, expense, or humiliation are either not caused by the defendant's wrong or need not have been, and therefore are not to be charged against him." *Id.* Whether labelled "mitigation" or "avoidance" as Williston describes it, the non-breaching party's duty is clear.

▮ With respect to mitigation in this case, it appears altogether clear that this requirement was absolutely met by plaintiffs, for shortly after NCR raised the issue of repudiation, all of the plaintiffs removed the NCR obligation from their respective loan charts and apparently invested the allocated funds elsewhere.

Since plaintiffs did in fact mitigate the extent of damages caused by defendant's breach of the agreement, the issue becomes one of determining damages in accordance with plaintiffs' "expectation," "reliance" or "restitution" interests. By a process of elimination, it appears that two of the three types of damages—"restitu-

tion" and "reliance" interest—are not at issue in this case. At one point in time plaintiffs did claim "restitution" interest through their request for specific performance. That claim, however, was withdrawn prior to trial.[7] Arguably, plaintiffs may have sustained damages based upon their "reliance" interest to the extent their employees expended efforts from January 20, 1976 when the loan commitment was finalized, to the date NCR terminated the commitment. However, no claim for such damages has been made by plaintiffs.[8] Thus the sole type of damages which plaintiffs are seeking is that relating to their "expectation" interests. As will be seen, plaintiffs have not, in fact, established beyond speculation and conjecture that they were, in fact, so damaged.

The sum total of damages plaintiffs attribute to defendant's breach is $1,783,709 to which must be added prejudgment interest in an amount of eight per cent (8%) per annum. Though simple arithmetic is involved in the ultimate calculation, the process leading up to deriving the separate figures which form the basis for the computation is not so simple.

 While the measure of damages for breach of an agreement to lend money is generally the difference between interest on the contract note and interest the non-breaching party incurred or earned in a substitute loan, *see Downing v. Dial*, 426 N.E.2d 416 (Ind.App.1981); *Doddridge v. American Trust & Savings Bank*, 98 Ind. App. 334, 189 N.E. 165 (1934), the substitute loan measure of damages is not feasible in this case because no particular funds were earmarked for the NCR loan. That is, the NCR loan funds were to be derived from the cash flow to plaintiffs resulting from the continued maturing of investments previously made and the availability of funds obtained from other sources. Thus, when the NCR loan funds were removed from each plaintiff's cash flow chart, the newly freed money was reinvested elsewhere, yet it is impossible to tell exactly where. Conceivably, some of the money went to other loans producing higher or lower interest and had longer or shorter yield terms.

Since it is impossible to tell exactly what happened to the NCR funds, plaintiffs argue that the measure of damages is the difference between interest on the NCR loan and a comparable loan after the breach. In this case the difference would be the $9\frac{7}{8}\%$ interest agreed upon by the parties and the interest rate on a comparable loan at the lower interest rate prevailing after the breach. Using this formula, plaintiffs calculate their damage claim essentially as follows. The total amount to be funded under the agreement was $13,-405,931.[9] This amount was to be loaned at $9\frac{7}{8}\%$ interest for a period of twenty-five years. Using the 8.5% prevailing rate for a comparable loan[10] in December of 1976, the damages are calculated as the difference between the interest on the $9\frac{7}{8}\%$ loan and the interest on the comparable loan with each interest amount reduced to present value as of December 1976. Graphically, the calculations are as follows:

| | |
|---|---|
| Present value of interest at $9\frac{7}{8}\%$ | $11,324,275 |
| Less present value of interest at 8.5% | − 9,536,486 |
| | $ 1,787,789 |

Thus, plaintiffs claim entitlement to damages in that amount.[11]

---

7. Record at 61–63.

8. It appears that in mortgage loan situations, the commitment fee is generally given to cover such types of damages should a breach occur. *See In Re Four Seasons, supra.*

9. *See* text, p. 1407, *infra.*

10. *See* text, p. 1408, *infra.*

11. At this juncture it should be noted that the figure relating to damages in excess of 1.5 mil-

lion dollars is the outermost figure of damages requested by plaintiffs. Perhaps anticipating the problems with the many uncertain variables involved in their calculations, plaintiffs, in their post-trial brief, urge that at a minimum, they are entitled to damages of approximately $750,-000.00 which takes into consideration the fluctuating interest rates between July and December of 1976; the amount of the capitalized costs for the building less the amount for the land upon which the headquarters was built; and the

As the above makes abundantly clear, plaintiffs' market damage theory rests upon several important assumptions. In making the calculations, plaintiffs presuppose, among other things, the amount of the loan, the length of time the loan would be outstanding, and the date for determining the comparative market rate with interest computed on a comparable loan as of that date.

▆ From the agreement between the parties, it is clear that the loan amount was contingent upon the certified costs of the building. The commitment provided in pertinent part:

> "It is understood that the loan amount provided herein is not to exceed the total capitalized cost ... of the subject office building project.... Should the certified total cost be less than $14,000,000 which the loan amount and monthly principal and interest installments will be reduced accordingly."

(Plaintiffs' Exhibit 1). The capitalized costs, as provided for in the above agreement, spent or committed to be spent by NCR prior to the expiration of the commitment, was $12,975,931. Plaintiffs' proposed figure is $430,000 above that amount and represents the inclusion of the fair market value of the land in the loan amount. As was borne out at trial, however, the parties did not intend to capitalize the cost of the land. Though NCR had proposed capitalizing the cost of the land in its amendments to the loan commitment, prior to the time of the clarifications to the amendment NCR had deleted the land from the items to be capitalized. (See defendant's Exhibit 3). Accordingly, any damage figure must be reduced correspondingly by the amount attributed to the capitalization of the land.

Were the amount attributed to the land the sole shortcoming in plaintiffs' damage formula, simple arithmetic could cure the

defect. However, other and more important problems exist.

One such problem is calculating the proper interest rate. A three step process is utilized by plaintiffs to arrive at that rate. First, in calculating a comparable investment, reference must be made to defendant NCR's credit rating. The answer can be easily ascertained by reference to "Moody's Industrial Manual" and "Moody's Bond Survey." These publications are used throughout the trade to determine a corporation's credit rating. During the relevant time period, NCR's credit rating as evidence by Moody's was in the "A" range. All parties agree that the "A" rating accurately depicts NCR's credit rating. The second step, which builds upon the first, entails applying the "A" credit rating to the "Solomon Brothers'" table. Here again the parties agree that the "Solomon Brothers'" figures are accurate and are commonly used to determine the monthly average yields on private placement. By using the "Solomon Brothers'" table in conjunction with Moody's "A" rating, one can easily determine what the average yield was for an "A" rated placement for any given month by simply looking at the table. But in order to do so one must know which month is in issue because during any given year, the rates fluctuate dramatically. Thus, the need for the third step referred to above.

It is this third step—the determination of the proper month—which has led to considerable disagreement between the parties. Plaintiffs choose December of 1976, which is the month during which the commitment expired, as the appropriate date. Defendant argues that either July of 1976, when the plaintiffs removed the loan from their charts, or October, 1976, when the loan was scheduled to be funded should be utilized.[12] While it would seem to make little difference which date is used, such is not the case, for during the calendar year

possibility that prepayment would occur. Yet, as will be seen, even these reductions do nothing to ameliorate what the court views to be the pitfall of plaintiffs' damage claims—the preponderance of the evidence does not support a claim to any quantifiable damages.

12. _See_ n. 11 _supra._

1976, interest rates were declining on a monthly basis. Thus, for July 1976, the Solomon monthly yield was 9.255%; for October 1976, 8.875%; and for December 1976, 8.625%. (Plaintiffs' Exhibit 52). Calculated on the basis of plaintiffs' damage formula, these respective interest rates have a marked effect on the amount of damages. The July figure (assuming no prepayment) would net damages in an amount of $766,469; the October figure would yield damages in the amount of $1,266,503; and the December figure would suggest that damages should be assessed at $1,608,663. (*Id.*). Over a five month period (July-December), the difference in the amount of potential damages would be an astounding $842,194.

■ Given the foregoing options, the court would have to conclude that the July date is the correct date for assessing damages. This is so because at common law, the date for determining the market in the event of anticipatory breach of a contract is the time of repudiation. *See Pillsbury Flour Mills Co. v. Walsh*, 60 Ind.App. 76, 110 N.E. 96 (1915); Jackson, *"Anticipatory Repudiation" and the Temporal Element of Contract Law: An Economic Inquiry into Contract Damages in Cases of Prospective Non Performance*, 31 Stan.L. Rev. (1975). While authority exists for the proposition that damages are to be computed as of the date fixed for performance (here October 1976), *Indiana Bell Telephone Co. v. Ice Service, Inc.*, 142 Ind.App. 23, 231 N.E.2d 820, 824 (1967), that doctrine is wholly inapplicable in the context of this case for plaintiffs, upon learning of NCR's decision, removed that commitment from their cash flow charts in July and reinvested elsewhere as of that date. *See In Re New York, New Haven & Hartford R.R. Co.*, 298 F.2d 761 (2d Cir.1962).

As with plaintiffs' inclusion of the land in its damage calculation, the use of the December 1976 rate could be rectified by substituting the July figure and recalculating damages accordingly. But again, other problems exist in plaintiffs' calculation which must be taken into consideration.

Part and parcel of plaintiffs' calculation is the argument that damages should be assessed for the entire twenty-five year period. That is, prepayment should not be assumed. While some authority exists for this proposition, *e.g. Pipkin v. Thomas & Hill, Inc.*, 298 N.C. 278, 258 S.E.2d 778, 785 (1979), it is not altogether clear that prepayment, to a greater or lesser extent, should not be factored into the calculations in this case. Arguably, prepayment could not be assumed for the first ten years because under the terms of the agreement, the loan was closed to prepayment:

> "The loan will be closed to prepayment during the first ten years of the loan term. Beginning in the eleventh year, privilege will be given to prepay in part or in full the principal then outstanding upon payment of a premium of 5% based on the amount so prepaid, said premium to decline ½ of 1% each year thereafter to a minimum of 1%."

(Plaintiffs' Exhibit 1). Yet, at any time in between the tenth and the twenty-fifth year, prepayment could occur. To a great extent, prepayment would depend upon the fluctuation in the market place and in this respect only a seer could determine in 1976 what would happen in 1986. But, as was established at trial, on numerous occasions, by plaintiffs' own witnesses, the average life of an "A" rated twenty-five year loan is about seventeen years—a figure markedly less than the one used in plaintiffs' original calculations. (Transcript Vol. I, p. 131). In fact, the Solomon Brothers' tables take into consideration the fact that prepayment might occur.

The above enumerated problems with respect to plaintiffs' damage calculations are not, by themselves, fatal to such an award. Adjustments presumably could be made with respect to each item. Such an adjustment would be in keeping with the notion that plaintiffs should not be made to suffer for defendant's breach and that "where there is doubt as to the exact proof of damages, such uncertainty must be resolved against the wrongdoer." *Gene B. Glick Co. v. Marion Construction Corp.*,

165 Ind.App. 72, 331 N.E.2d 26, *reh. denied,* 165 Ind.App. 72, 333 N.E.2d 140 (1975); *accord Burns Brother Plumbers, Inc. v. Grovers Venture Co.,* 412 F.2d 202 (6th Cir.1969). Yet before such uncertainty can be resolved against the wrongdoer, it is incumbent upon plaintiffs to prove that they have, in *fact,* been damaged. *Rauch, supra; Alexander Hamilton Institute v. Jubelt,* 89 Ohio App. 480, 102 N.E.2d 741 (1951). That fact, in the court's view, has not been proven in this case. In an effort to shed some light regarding the court's reasoning on this issue, a brief overview of plaintiffs' lending procedure, as borne out at trial, is necessary.

Plaintiffs are in the investment business. During calendar years 1975 and 1976 plaintiff Lincoln carried approximately 2.5 billion dollars in investment (exclusive of policy loans); Provident Mutual carried approximately 1.1 billion dollars in investments; Provident Life and Accident approximately 900 million dollars in investments; and Tennessee Life and Casualty 600 million dollars in investments. (Defendant's Exhibits O, P, Q, R). These investments consisted primarily of bonds, stocks, mortgage loans and real estate. (*Id.*). In order to secure funding at the appropriate time, each proposed loan is placed on a cash flow chart. These cash flow projections, for the most part, are simply charts in which estimated lending dates of future investments are listed. Through the use of these charts, plaintiffs are able to predict what their cash needs will be in the future. (Transcript Vol. I, pp. 164–8). Though an item is listed on the cash flow chart, no funding is allocated for that item until shortly before the targeted funding date.

With respect to the inclusion of the NCR loan on each of plaintiffs' cash flow charts, it is altogether clear that no investments were changed as the result of that inclusion. (Transcript Vol. I, pp. 72–4; pp. 165–66.) In fact, the proposed loan to NCR was placed on each of plaintiff's cash flow charts *before* committee approval. (*Id.;* Vol. I, p. 159; 214). And, the funding was removed from the charts within two months after NCR's notification that it intended not to take down the funds.

The foregoing scenario of inclusion and deletion indicates that the proposed funding for NCR was nothing more than a paper transaction. The inclusion of the NCR loan commitment on plaintiffs' charts was done to prepare for a future contingency—funding—which did not occur. Moreover, plaintiffs were aware that the loan would not be made sufficiently in advance of the targeted funding date that they had not changed any investments in preparation for funding.

So what, in fact, happened to the money which would have gone to NCR? The answer is not altogether clear. It is clear, however, that any money which would have gone to NCR was reinvested elsewhere. (Transcript Vol. I, p. 87; p. 169; pp. 215–21). What those investments were, what the terms of those investments were, and what the yield of those investments were, is impossible to determine. Certainly some were below the rate to be charged NCR and had earlier maturity dates, while other investments of comparable terms in years yielded higher interest rates. (*Id.*). Generally, however, long term loans such as those proposed to NCR have turned out to be bad investments. (Defendant's Exhibit M). In this respect an interesting query arises as to what value it was to plaintiffs in *not* tying up nearly 13 million dollars for twenty-five years at 9⅞% interest. It is not idle speculation to assume that part and parcel of plaintiffs' motion to withdraw their request for specific performance stemmed from the fact that in today's market the NCR loan proposal could not be viewed as a good prospect. That at the time of trial the NCR loan proposal could not be viewed as a good proposal was made abundantly clear by Alex Jokay of Lincoln who testified as follows:

Q. Mr. Jokay, long term investment rates are significantly above at this point in time above rates in 1976, are they not?

A. Yes.

Q. As a matter of fact, isn't it also true that long term investments at 1976 rates have turned out to be not very good for your company, in terms of rates of return, you are borrowing money at higher rates?

A. That is right.

Q. As a matter of fact, there is a statement stipulated as exhibit M in the record, where your President, Ian Rolland, stated that, "You can't take risks by investing over a long period of time. We have been burned badly in this environment and it will be a long time before we risk investmenting [sic] assets in long term projects."

Is that a fair statement?

A. Yes.

Q. Is that your company's policy?

A. Yes.

Q. You don't any longer even make long term investments of this type, at least without an equity participation?

A. That is correct.

Q. Because they have been very bad investments, have they not?

A. Yes.

Q. Isn't it also true, Mr. Jokay, that had this loan actually been made, NCR could have made a handsome gain reinvesting that 9 and 7/8th money?

A. Depending on the time when they would have reinvested it.

Q. Was it depending on whether or not they put it long term?

A. Yes, what they did with the money. If NCR knew more than all the other lenders knew in 1976 and kept the money in a shoe box and then came out in 1982 or 1981 and invested it at today's high rates, they would have made a lot of money, but if they did what everybody else did and had gone long term they wouldn't have done any better.

\* \* \* \* \* \*

Q. Mr. Jokay, what is a comparable long term rate today of this type loan?

A. It is certainly hard to say. There is hardly anyone that is making long term loans today. I would say that if you wanted to borrow for 25 years today, I don't know whether you can do it or not.

Q. If you could the rate would be substantially above 9 and 7/8ths?

A. I would say probably 15.

Q. If you were willing to lend money today at 15 percent for 25 years, are there people willing to borrow it at that rate?

A. There would be a great many people that would like to borrow money, but very few would lend it.

(Transcript Vol. I, pp. 106–7; 112) Thus, by plaintiffs' own witness, it is clear that plaintiffs, in effect, actually benefited, or at least did not lose money because of defendant's breach.

■■■ In sum, this court is of the view that plaintiffs have not established that they were in fact damaged. While they need not trace the particular funds allocated to NCR, *Pipkin, supra,* it is nonetheless incumbent upon them to show that damage resulted from NCR's breach. Though they may have been entitled to "reliance interest" damages to the extent that their employees expended efforts subsequent to January 20, 1976 (when the loan commitment was finalized) and the date that NCR terminated the commitment, they have claimed no such damages. And since they have not proven that the NCR breach had any effect upon their investment opportunities they have not shown entitlement to damages for their expectation interest. In short, plaintiffs have wholly failed to show by a preponderance of the evidence that they lost anything as a result of defendant NCR's breach.

### Conclusion

On the basis of the foregoing, the court finds that a binding, enforceable contract existed between the parties. Since NCR breached the same the court finds in favor of the plaintiffs and against the defendant. The court further finds that plaintiffs have not met their burden with respect to their claim for damages, and accordingly, no damages will be awarded. Costs assessed

against defendant and in favor of the plaintiffs.